# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1643

_____

| | | |
|---|---|---|
| Kerry D. Ogden, | * | |
| | * | |
| Plaintiff - Appellee, | * | Appeal from the United States |
| | * | District Court for the Northern |
| v. | * | District of Iowa |
| | * | |
| Wax Works, Inc., | * | |
| | * | |
| Defendant - Appellant. | * | |

_____

Submitted: December 17, 1999
Filed: June 6, 2000

_____

Before **RICHARD S. ARNOLD,** and **LOKEN,** Circuit Judges, and **WEBB,**[1]
District Judge.

_____

**WEBB,** District Judge.

## I.

Wax Works, Inc. (Wax Works) appeals a post-trial order of the United States
District Court for the Northern District of Iowa,[2] denying its motion for JAML, or,
alternatively, new trial, following a jury verdict in favor of plaintiff/appellee Kerry

_____

[1] The **HONORABLE RODNEY S. WEBB,** Chief Judge, United States
District Court, District of North Dakota, sitting by designation.

[2] The **HONORABLE MARK W. BENNETT,** Chief Judge.

D. Ogden (Ogden) on her claims of unlawful employment discrimination in violation of Title VII.[3]  Following a five day trial, the jury found Ogden was subjected to hostile environment and quid pro quo sexual harassment, and retaliation, and further found Ogden was constructively discharged.  The jury awarded Ogden $40,000.00 in compensatory damages, $792.00 in pre-termination back pay, $75,599.00 in post-termination back pay, and $500,000.00 in punitive damages ($300,000.00 on the hostile environment claim and $200,000.00 on the retaliation claim).  The district court entered judgment accordingly, save for the punitive damages award, which was reduced to $260,000.00 pursuant to 42 U.S.C. § 1981a(b)(3)(D).  The district court also awarded Ogden $69,768.00 in front pay.

On appeal, Wax Works argues there was insufficient evidence to support Ogden's sexual harassment, retaliation, constructive discharge, and punitive damages claims.  Alternatively, Wax Works contends the district court abused its discretion by failing to grant a new trial.  We affirm.

## II.

Predictably, the testimony "varied wildly" according to whose witnesses were testifying.  "We, of course, do not resolve these discordant accounts[] . . . ."  Howard v. Burns Bros., Inc., 149 F.3d 835, 838 (8th Cir. 1998).  Rather, we consider the evidence in the light most favorable to Ogden, assuming all conflicts were resolved in her favor, assuming all facts her evidence tended to

---

[3]  42 U.S.C. § 2000e et seq.

prove, and giving her the benefit of all favorable inferences that reasonably may be drawn from the proven facts.  See Morse v. Southern Union Co., 174 F.3d 917, 922 (8th Cir. 1999).

Wax Works owns and operates a chain of music stores under the name "Disc Jockey," along with a small chain of video stores under the name "Reel Collections."  On May 3, 1987, Wax Works hired Ogden as the sales manager for a newly-opened Disc Jockey in a Sioux City, Iowa mall.  Ogden remained in that position until she left Wax Works in September, 1995.

During her tenure, Ogden reported directly to a district manager, who was responsible for supervising several stores in a geographic region.   Among the district manager's duties was the performance of yearly evaluations, the completion of which was a prerequisite to a sales manager's annual raise.  The district manager, in turn, reported to a regional manager, who was responsible for overseeing several district managers and their respective stores.  The regional manager reported to the Wax Works home office.

Ogden developed into an outstanding store manager by all accounts.  Sales at her store increased throughout her tenure, and she routinely received bonuses and awards for her efforts.

## A.   The Harassment

Ogden alleged she was sexually harassed by her district manager, Robert Hudson, from late June-early July, 1994, until she left Wax Works in September, 1995.  Hudson, who lived in Omaha, Nebraska, became Ogden's district manager in 1993.

Ogden described three occasions on which Hudson subjected her to unwelcome physical advances.  In late June-early July, 1994, an intoxicated Hudson grabbed Ogden by the waist and asked her to his motel room as the two were leaving a restaurant.  Ogden refused the invitation, pushed Hudson away, and told him not to touch her.  On St. Patrick's Day, 1995, an intoxicated Hudson twice put his arm around Ogden while the two were in a Sioux City bar with a group of employees.  Each time Ogden pushed Hudson away and told him to leave her alone. Hudson made a similar advance in April, 1995, which Ogden rebuffed with a physical threat.

In addition to these physical advances, Hudson propositioned Ogden incessantly.  He constantly asked her to go for drinks after work.  He asked her on several occasions to stay with him at his home in Omaha and "party."  He asked her to a motel room during a convention in October, 1994, and on another occasion asked her to attend a concert.

Hudson took an inappropriate interest in Ogden's personal life, as well.  He once offered to stay at Ogden's home to "protect" her from her estranged ex-

husband. He berated Ogden upon learning she had taken a canoe trip with a male companion. On another occasion, he became angry with Ogden when a male friend visited her in Sioux City.

When Ogden rebuffed these advances and propositions, Hudson responded by mistreating her at work. He constantly criticized her performance and routinely screamed at her over work matters shortly after she refused to go out with him.

Ogden's account was corroborated at trial. Ogden's former employee, Chris Shook, and friend, Holly Longwell, each recalled witnessing Hudson subject Ogden to unwelcome physical advances. Shook testified Hudson often asked whether Ogden had "somebody else in her life," and expressed a desire to stay with Ogden to protect her from her ex-husband. Shook also testified Hudson yelled at Ogden in front of other employees, and treated her differently than others.

Ogden also alleged Hudson conditioned her 1995 evaluation, and thereby her raise, upon her willingness to submit to his advances; and subsequently refused to effectuate her 1995 raise in retaliation for her refusal to submit to him. In April, 1995, Ogden's regional manager, Jeff Klem, ordered Hudson to perform Ogden's evaluation immediately to effectuate her annual raise.[4] Hudson did not do so, however, despite several subsequent requests by Ogden. Instead, he "held Ogden's evaluation over her head." Finally, in late June, 1995, Hudson told Ogden he would

---

[4] Ogden routinely received $1000.00 annual raises during her tenure. In 1995, she was to receive an additional $500-1,500 raise for managing a newly-opened Reel Collections in the same Sioux City mall.

perform her evaluation if she agreed to accompany him on a "three-day gambling spree." When Ogden ultimately refused, Hudson responded by berating her over a personnel matter, and refusing her request to take a vacation. Hudson subsequently refused yet another request from Ogden to conduct her evaluation. Ogden ultimately left Wax Works without her 1995 raise. Ogden also testified that prior to these events, Hudson made no secret of his predilection for affairs with other employees, and boasted of the raises and promotions he procured for those with whom he was involved. Moreover, Hudson told Ogden she would not have received a raise in 1994, if not for his efforts.

Ogden and others described the impact Hudson's mistreatment had upon her physical and mental health. On several occasions, Hudson's beratings caused Ogden to leave work in tears. Her personality changed completely, from outgoing to withdrawn. She became depressed and lost interest in doing anything outside of work. She was unable to sleep or eat, and lost some 40 pounds between January and August of 1995. She fell ill for days at a time and consequently missed more work. She began drinking and smoking to excess.

### B. Wax Works' Response

On August 9, 1995, a confrontation arose between Ogden and Hudson over Hudson's desire to promote Shook to manage a store in Sioux Falls, South Dakota. Ogden initially called Klem to protest the move, but Klem told her to address her concerns directly to Hudson. Ogden balked at first, telling Klem she feared Hudson. When Ogden ultimately confronted Hudson, he "exploded," threatening to block

future raises for Ogden's employees and "squish [her] out like a little fly." The confrontation ended with Hudson following Ogden to her car, screaming and smacking his fist.

Two days later, Ogden called Klem and described the confrontation. She also reported to Klem that Hudson yelled at her because she would not go out with him. According to Ogden, Klem responded "I know exactly what you're telling me. I know about [Hudson's affairs with other employees], and [Hudson's] been warned before[] . . . ."[5] Ogden threatened to quit should Hudson remain her supervisor, but Klem urged her not to do so, and told her he would address her complaints to the home office.

When the two spoke a few days later, however, Klem told Ogden he had been assured by Hudson that the matter was merely a personality conflict, which had since been resolved. Ogden insisted this was not the case; rather, Hudson had been "treating her like a dog" because she refused to go out with him. She also

---

[5] Indeed, there was evidence that Klem and other members of Wax Works upper management were aware of Hudson's inappropriate behavior long before Ogden complained in August, 1995. Klem admitted at trial that he had previously warned Hudson to stop his inappropriate relationships with fellow employees, as well as his inappropriate conduct with fellow employees after working hours. Moreover, Ogden testified that Klem once asked her, in Hudson's presence, whether Hudson was causing her problems; and on another occasion told Ogden he was aware she had problems with Hudson. Dale Taylor, a Wax Works vice president, also admitted he had heard "rumblings" of Hudson's inappropriate relationships with other employees and conduct after working hours.

described more of Hudson's objectionable conduct, including his offers to stay at her home. Klem ultimately agreed to travel to Sioux City to meet with all parties involved. According to Ogden, however, his demeanor had "totally changed" from their prior conversation; he "minimize[d] [Hudson's conduct] just like nothing had happened."

Klem visited Sioux City as promised August 21-24, 1995, but Ogden was unable to meet with him due to illness.[6] Klem interviewed several of Ogden's employees during his visit, but one of them, Shook, testified his questions focused upon Ogden's performance, rather than Hudson's conduct.

For her part, Ogden called Klem after he left Sioux City and offered to discuss her complaints over the phone. Klem refused, stating "You didn't come in. You missed your chance." Klem told Ogden that Wax Works viewed Hudson as an "asset" to the company and saw no reason to fire him. Ogden then asked whether, in the wake of her allegations, she could continue to work for Hudson. Klem replied, "No, you can't." Ogden left Wax Works on September 9, 1995. She twice called the home office in an attempt to address her complaints to a vice president prior to her departure, but her calls went unreturned.

Ogden was physically and emotionally devastated by Hudson's harassment and the loss of her position. Her psychotherapist testified she suffered from

---

[6] At trial, Ogden introduced phone records to indicate she called in four times during Klem's visit.

posttraumatic stress disorder and major depression, and attributed these maladies to Hudson's abuse. After spending several months confined to her home, she eventually secured two part-time jobs, one in sales, the other in light janitorial work, at significantly reduced pay and responsibility. Hudson, meanwhile, received no discipline for his behavior, and nothing about the incident was placed in his personnel file. After filing the requisite complaints with state and federal agencies, and receiving notice of her right to sue, Ogden brought this action on December 9, 1996.

During Ogden's tenure, Wax Works distributed to all store managers an employee handbook containing the following summary of its sexual harassment policy:

> * Sexual Harassment
>
> Unwelcome sexual advances, request[s] for sexual favors and other verbal or physical conduct of a sexual nature constitutes sexual harassment. Sexual harassment exists if this type of conduct becomes a condition of an individual's employment, or it is used as a basis for employment decision[s]. Also, sexual harassment constitutes conduct which interferes with an individual's work performance or creates an intimidating work environment.
>
> Employees are encouraged to report any alleged violations of this policy immediately to a member of management or directly to the Director of Human Resources. All such complaints will be held in confidence and will be investigated thoroughly. Appropriate action will be taken.

Additionally, Wax Works posted signs in stores encouraging employees with

grievances to call the home office toll-free. Ogden received no training with regard to the sexual harassment policy, however, and Wax Works admittedly provided no such training during her tenure.

Hudson testified to his familiarity with the policy, and stated that he had received "extensive training on sexual harassment issues" in conjunction with his M.B.A.

**III.**

We review the denial of a motion for judgment as a matter of law de novo, using the same standards as the district court.[7] <u>Douglas County Bank & Trust Co. v. United Fin. Inc.</u>, 207 F.3d 473, 477 (8th Cir. 2000). "Because the law places a high standard on overturning a jury verdict, JAML is proper only when there is a complete absence of probative facts to support the conclusion reached so that no reasonable juror could have found for the nonmoving party." <u>Blackmon v. Pinkerton Sec. & Investigative Serv.</u>, 182 F.3d 629, 635 (8th Cir. 1999). Our review is extremely deferential; to prevail on its motion for JAML, Wax Works faces the difficult task of demonstrating all the evidence points in its direction and is

---

[7] Ogden urges us to reject Wax Works' request for JAML in toto due to its failure to renew the motion at the close of all evidence. However, the record reflects the district court took Wax Works' original motion under advisement after taking several witnesses out of order. As a result, only a short time elapsed between the original motion and the close of evidence. We find it appropriate to reach the merits under these circumstances. <u>See</u> <u>BE&K Constr. Co. v. United Bhd. of Carpenters and Joiners of America, AFL-CIO</u>, 90 F.3d 1318, 1325 (8th Cir. 1996).

susceptible of no reasonable interpretation sustaining Ogden's position.  See Morse, 174 F.3d at 922.

Wax Works first argues there was insufficient evidence to support Ogden's quid pro quo[8] and hostile environment[9] sexual harassment claims.  We disagree, and we find these arguments merit little discussion.  Ogden's testimony supported the jury's conclusion that her submission to Hudson's unwelcome advances was a condition for receiving her 1995 raise, and her refusal to submit to his advances resulted in the denial of the same.  See Cram v. Lamson & Sessions Co., 49 F.3d 466, 473 (8th Cir. 1995).  Moreover, the jury reasonably concluded the drumbeat of

---

[8] To prevail on her quid pro quo claim, Ogden needed to prove (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment.  Cram v. Lamson & Sessions Co., 49 F.3d 466, 473 (8th Cir. 1995).

[9] To prevail on her hostile environment claim, Ogden needed to prove  (1) she belonged to a protected group; (2) she was subjected  to unwelcome harassment; (3) the harassment was based on sex; and (4) the harassment affected a term, condition, or privilege of her employment.  See Schmedding v. TNEMEC Co., Inc., 187 F.3d 862, 864 (8th Cir. 1999).  Harassment affects a term, condition, or privilege of employment if it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an objectively hostile or abusive work environment.  Howard, 149 F.3d at 840 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) and Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986)).  Relevant factors for determining whether conduct rises to this level include its frequency; severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. (citing Harris, 510 U.S. at 23).

physical advances, propositions, and mistreatment Ogden endured from Hudson for more than a year was both unwelcome and offensive, and sufficiently severe or pervasive to alter the conditions of Ogden's employ and create an objectively hostile or abusive work environment. See Howard, 149 F.3d at 840 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) and Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67 (1986)).

Of course, in "supervisor harassment" cases such as this, the terms "quid pro quo" and "hostile environment" remain relevant only to the extent they illustrate the evidentiary distinction between cases involving threats which are carried out and those featuring offensive conduct in general. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-54 (1998). Once a plaintiff proves discrimination under either theory, we turn to the standards announced by the Supreme Court in Ellerth and Faragher to determine whether the employer may be held liable for the supervisor's conduct. In Ellerth and Faragher, the Supreme Court established that under Title VII, employers are vicariously liable for hostile environment sexual harassment perpetrated by a supervisor. Ellerth, 524 U.S. at 764-65; Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998). Where the plaintiff suffers no tangible employment action, however, the employer is entitled to establish by a preponderance of the evidence an affirmative defense consisting of two elements: (a) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, 524 U.S. at 764-65; Faragher, 524 U.S. at 807-08.

Here, the district court instructed the jury to consider the defense with respect to Ogden's hostile environment claim, but not her quid pro quo claim. In retrospect, however, the court questioned whether Wax Works was entitled to avail itself of the defense at all. We agree with the district court. The Ellerth/Faragher rule is clear: "No affirmative defense is available[] . . . [] when the supervisor's harassment culminates in a tangible employment action . . . ." Ellerth, 524 U.S. at 764-65; Faragher, 524 U.S. at 807-08.

Even assuming Wax Works was entitled to raise the defense, it was reasonably rejected by the jury. There was substantial evidence indicating that Wax Works neither conducted the "thorough investigation" nor took the "appropriate action" promised by its sexual harassment policy, belying its claim to have exercised reasonable care to "prevent and correct promptly . . . sexually harassing behavior." According to the testimony of Ogden and others, Wax Works "minimized" her complaints; performed a cursory investigation which focused upon her performance, rather than Hudson's conduct; and forced her to resign while imposing no discipline upon Hudson for his behavior. See Baty v. Williamette Indus., Inc., 172 F.3d 1232, 1242-43 (10th Cir. 1999)(finding the lack of disciplinary action against a harassing employee relevant to an analysis of the employer's response). Moreover, the jury could have reasonably concluded Ogden took advantage of the "opportunities" afforded by Wax Works and/or attempted to "avoid harm otherwise." She complained to a member of Wax Works management (Klem), arguably in

accordance with the company's sexual harassment policy,[10] and on several occasions directly told Hudson to stop his offensive conduct.

Wax Works next argues Ogden's retaliation claim[11] must fail because she did not engage in the "protected activity" requisite for this theory of liability. Ogden maintains she engaged in "the most basic form of protected activity" when she told her supervisor, Hudson, to stop his offensive conduct. See Quarles v. McDuffie County, 949 F.Supp. 846, 853 (S.D. Ga. 1996). We agree with Ogden. Employers may not retaliate against employees who "oppose discriminatory conduct," see 42 U.S.C. § 2000e-3(a), and the jury reasonably concluded Ogden did so when she told Hudson to stop his offensive behavior. Cf. E.E.O.C. v. HBE Corp., 135 F.3d 543, 554 (8th Cir. 1998). Ogden's testimony further supported the jury's conclusion that Hudson's denial of her raise was causally connected to her opposition.[12] See Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 968 (8th Cir. 1999).

_____

[10] Wax Works can scarcely argue that Ogden's complaints failed to provide notice of Hudson's sexually harassing behavior. Indeed, Klem's own notes indicated Ogden told him Hudson (1) abused her; (2) yelled at her constantly; and (3) withheld her raise.

[11] To prevail on her retaliation claim, Ogden needed to prove (1) she filed a charge of harassment or engaged in other protected activity; (2) Wax Works subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to her protected activity. See Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 968 (8th Cir. 1999).

[12] Notwithstanding Wax Works' arguments, the timing of Ogden's prior raises is of no moment, since, according to Ogden's testimony, Klem ordered Hudson to effectuate her 1995 raise in April of that year, and Hudson did not do so at any time prior to Ogden's departure from Wax Works in September, 1995.

Wax Works next argues there was insufficient evidence to support Ogden's constructive discharge.[13] We disagree. The jury reasonably concluded Hudson's harassment rendered Ogden's working conditions objectively intolerable; and, given Ogden's testimony that Klem told her she could no longer remain with the company in the wake of her allegations, that Wax Works either intended to force Ogden to resign or could have reasonably foreseen she would do so. See Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999). In addition, we have held if an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge. Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997). The jury could have so concluded here, given Wax Works' response to Ogden's complaints. See Van Steenburgh v. Rival Co., 171 F.3d 1155, 1160 (8th Cir. 1999).[14]

---

[13] To establish her constructive discharge, Ogden needed to show that a reasonable person would have found the conditions of her employ intolerable and that the employer either intended to force her to resign or could have reasonably foreseen she would do so as a result of its actions. See Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1017 (8th Cir. 1999)(citations omitted).

[14] Wax Works also challenges "the evidence supporting the front pay award," and argues the award should have been capped by the district court pursuant to 42 U.S.C. § 1981a. Wax Works has not briefed the issue beyond its objections to the constructive discharge claim, however, and we deem any objections not raised to be abandoned. See Fed. R. App. P. 28(a)(4); Kerns, 178 F.3d at 1018. In any event, the district court correctly ruled that front pay is an equitable remedy excluded from the statutory limit on compensatory damages in § 1981a, see Kramer v. Logan County Sch. Dist. No. R-1, 157 F.3d 620, 626 (8th Cir. 1998), and properly exercised its discretion in making the award and arriving at the amount. See Ogden v. Wax Works, Inc., 29 F.Supp.2d 1003 (N.D. Iowa 1998).

Wax Works next argues there was insufficient evidence to support the punitive damages award. Our inquiry into this issue is now governed by Kolstad v. American Dental Ass'n, 119 S.Ct. 2118 (1999), rendered June 21, 1999, while the parties were briefing this appeal.

In Kolstad, the United States Supreme Court clarified "[t]he precise burden a plaintiff must carry to prove malice or recklessness for purposes of 42 U.S.C. § 1981a(b)(1) . . . ." E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1244 (10th Cir. 1999)(citing Kolstad, 119 S. Ct. 2118 (1999)). "Under the terms of [§ 1981a(b)(1)], . . . punitive damages are available in claims under Title VII . . . . [where] the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" Kolstad, 119 S. Ct. at 2121 (citing § 1981a(b)(1)). The Kolstad Court rejected an interpretation which would have required "egregious" conduct by an employer before punitive damages could be available under this provision.[15] Id. at 2124. Instead, the Court interpreted § 1981a(b)(1) to provide for punitive awards based solely on an employer's state of mind: "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. Applying this standard in the context of § 1981a, the Court held an employer must at least discriminate in the face of a "perceived risk that its actions will violate federal law" to be liable in punitive damages. Id. at 2125.

_____

[15] We had previously rejected such an interpretation in Kim v. Nash Finch Co., 123 F.3d 1046, 1065 (8th Cir. 1997).

The Court made clear, however, that the punitive damages inquiry does not end with a showing of the requisite malice or reckless indifference on the part of certain individuals; the plaintiff must impute liability for punitive damages to the employer.  See Kolstad, 119 S. Ct. at 2126.  For these purposes, the Court adopted the Restatement (Second) of Agency § 217C, which, of relevance to this appeal, "contemplates liability for punitive awards where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.'"  Id. (citing Restatement (Second) of Agency, § 217C)).  Allowing that "no good definition of what constitutes a 'managerial capacity' has been found[,]" the Court suggested a "factual inquiry" focusing upon "the type of authority that the employer has given to the employee, [and] the amount of discretion that the employee has in what is done and how it is accomplished." Id. at 2128-29 (citing Restatement (Second) of Torts, § 909).  The Court interpreted the "scope of employment" requirement broadly:  "[I]ntentional torts are within the scope of an agent's employment if the conduct is 'the kind [the employee] is employed to perform,' 'occurs substantially within the authorized time and space limits,' and 'is actuated, at least in part, by a purpose to serve the' employer. [S]o long as these rules are satisfied, an employee may be said to act within the scope of employment even if the employee engages in acts 'specifically forbidden' by the employer and uses 'forbidden means of accomplishing results.'"  Id. (citing Restatement (Second) of Agency, §§ 228, 230).

"Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the . . . limits on vicarious liability for punitive damages," the Court created an exception to the Restatement rule whereby an

-17-

employer may escape vicarious liability for the discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's "good faith efforts to comply with Title VII." See Kolstad, 119 S. Ct. at 2129. The Court left to lower courts the determination of what measures constitute "good faith efforts," stating only that "Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms[,]" and "[t]he purposes underlying Title VII are similarly advanced where employers are encouraged to adopt anti-discrimination policies and to educate their personnel on Title VII's prohibitions." Kolstad, 119 S. Ct. at 2129.

Because Wax Works did not object to the punitive damages instruction in the district court or on appeal, we apply Kolstad to the record before us, asking whether a reasonable jury could find Wax Works liable for punitive damages.[16] We hold

---

[16] See, e.g., Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 436-37 (4th Cir. 2000); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 282-84 (5th Cir. 1999); E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999). The district court's instructions understandably did not forecast Kolstad's precise standards of intent and agency, or its good faith exception to vicarious liability. But, as previously mentioned, Wax Works neither requested any such instructions at trial nor challenges the instructions here; rather Wax Works contends that Ogden's failure to submit sufficient evidence to establish her punitive damages claim entitles it to JAML on the issue. This presents a purely legal question to this court on review, see Hyatt v. Robb, 114 F.3d 708, 711 (8th Cir. 1997), and requires us to apply the law as it exists today, "not what the court announced the law to be in its instructions." Grand Lab., Inc. v. Midcon Labs of Iowa, 32 F.3d 1277, 1280 (8th Cir. 1994). See Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 97 (1993)(Supreme Court decisions apply retroactively and prospectively to all cases on direct appeal whenever applied to the litigants before the Court). Thus, the question becomes whether the present record contains sufficient evidence to "reveal

there is substantial evidence from which a reasonable jury could find Wax Works liable for punitive damages under the clarified standards of Kolstad.

Concerning Hudson's malice or recklessness, Wax Works can scarcely dispute that, based on the record as discussed above, a reasonable jury could have found Hudson's behavior "sufficiently abusive" to manifest the requisite malice or reckless disregard for Ogden's rights.[17]  See Kimbrough v. Loma Linda Dev., Inc., 183 F.3d 782, 785 (8th Cir. 1999).  Moreover, Wax Works' sexual harassment policy forbade "[u]nwelcome sexual advances, request[s] for sexual favors and other verbal or physical conduct of a sexual nature[,]" as well as "conduct which interferes with an individual's work performance or creates an intimidating work

whether a reasonable jury could have found" Wax Works liable for punitive damages under the clarified standards of Kolstad.  Todd v. Ortho Biotech, Inc., 175 F.3d 595, 598-99 (8th Cir. 1999) (citing Hill v. International Paper Co., 121 F.3d 168, 176-77 (5th Cir. 1997))(acknowledging this standard of review but remanding where the record contained insufficient evidence to apply it); see also Boyle v. United Tech. Corp., 487 U.S. 500, 513-15 (1988)(plaintiff's right to jury trial would not be denied by applying a different defense on appeal than that given to jury, if evidence presented would not suffice, as matter of law, to support jury verdict under properly formulated defense).  We conclude the record contains ample evidence to allow us to make this determination in this case.

[17]  Indeed, Kolstad arguably "left intact" the jury's determination on this issue. See Deffenbaugh-Williams, 188 F.3d at 286 (citing Kolstad, 119 S. Ct. at 2124-26). The jury was instructed, in accordance with the Supreme Court's decision in Smith v. Wade, that it could award punitive damages only upon a finding of reckless or callous indifference to Ogden's rights, and its consideration was not limited to "egregious" conduct.  See Kolstad, 119 S. Ct. at 2124-25 (citing Smith v. Wade, 461 U.S. 30 (1983)). ("We gain an understanding of the meaning of the terms 'malice' and 'reckless indifference,' as used in § 1981a, from this Court's decision in Smith v. Wade.").

-19-

environment." Hudson testified to his familiarity with the policy, and claimed he received "extensive training on sexual harassment issues" in conjunction with his M.B.A. A jury could therefore infer Hudson had knowledge of Title VII's proscriptions, and given this knowledge, reasonably conclude he acted in the face of a perceived risk that his actions would violate federal law. See Alexander v. Fulton County, Georgia, 207 F.3d 1303, 1338 (11th Cir. 2000); Lowery, 206 F.3d at 443-44; E.E.O.C., 187 F.3d at 1246.

Concerning Wax Works' vicarious liability under the Restatement (Second) Agency §217C, there is substantial evidence that Hudson served in a managerial capacity and acted within the scope of his employ. Hudson undisputedly supervised several stores, and possessed the authority to schedule and conduct performance evaluations, and thereby to effectuate employee raises. These duties were the kind he was employed to perform; his abusive conduct occurred for the most part during working hours on Wax Works premises; and his conduct was "actuated in part to serve Wax Works." Lowery, 206 F.3d at 444-45; E.E.O.C., 187 F.3d at 1248. See Kolstad, 119 S. Ct. 2128-29.

Concerning its purported "good faith efforts to comply with Title VII," Wax Works points to its written sexual harassment policy, and policy of encouraging employees with grievances to contact the home office. "Plainly, such evidence does not suffice, as a matter of law," to establish "good faith efforts" in the face of substantial evidence that the company "minimized" Ogden's complaints; performed a cursory investigation which focused upon Ogden's performance, rather than Hudson's conduct; and forced Ogden to resign while imposing no discipline upon

Hudson for his behavior. Deffenbaugh-Williams, 188 F.3d at 286 (Wal-Mart's policy of encouraging employees to contact management with grievances did not suffice to establish good faith efforts as a matter of law, in light of Wal-Mart's failure to respond effectively to plaintiff's complaints).[18]

## IV.

A motion for a new trial should only be granted if the jury's verdict was against the great weight of the evidence so as to constitute a miscarriage of justice. Denesha v. Farmers Ins. Exch., 161 F.3d 491, 497 (8th Cir. 1998). We review the denial of a motion for a new trial for abuse of discretion. Bevan v. Honeywell, Inc., 118 F.3d 603, 612 (8th Cir. 1997).

Wax Works' request for a new trial centers largely upon its contention that the district court abused its discretion when it admitted into evidence a five-minute videotape depicting the lewd activities which took place during a 1987 company convention. Wax Works maintains the videotape incited the passion and prejudice of the jury, as reflected in the verdict and damages awarded. We disagree. The admission of evidence is committed to the sound discretion of the district court, and we review these decisions only for a clear abuse of discretion. Id. Here, the district court allowed the videotape into evidence during rebuttal after a Wax Works witness disputed Ogden's account of the 1987 convention, and subsequently instructed the jury to consider Wax Works' pre-1994 conduct only as "relevant

---

[18] See Lowery, 206 F.3d at 444-46; E.E.O.C., 187 F.3d at 1248. Cf. Blackmon, 182 F.3d at 636 (citing Carter v. Chrysler Corp., 173 F.3d 693, 702 (8th Cir.1999)).

background evidence," and not for purposes of awarding damages. Under these circumstances, we hold the district court did not abuse its discretion. Moreover, a new trial is not warranted on the basis of an evidentiary ruling unless the evidence was so prejudicial that a new trial would likely produce a different result. Id. The videotape was not so prejudicial, in light of the substantial evidence presented by Ogden in support of her case.

We further find, for the reasons set forth above, that the jury's verdict was not against the weight of the evidence. See id. ("A district court's determination that the verdict is not against the weight of the evidence is virtually unassailable.").

Finally, we reject Wax Works' argument that the jury's $500,000.00 punitive damages award was excessive. The district court reduced the award to $260,000.00 pursuant to § 1981a(b)(3)(D), reducing the ratio to compensatory damages to 6.5 to 1. "We do not think this amount is excessive as a matter of law, given the abusive and repeated harassment [Ogden] suffered at the hands of supervisor [Hudson]." Kimbrough, 183 F.3d at 785 (upholding a punitive award with a 10 to 1 ratio to compensatory damages).

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.