# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-2424NE

_____

Stanley D. Dowd and                    *
Richard Brown, Jr.,                    *
                                       *
            Appellees,                 *
                                       *   On Appeal from the United
    v.                                 *   States District Court
                                       *   for the District of
                                       *   Nebraska.
United Steelworkers of America,        *
Local No. 286,                         *
                                       *
            Appellant.                 *

_____

Submitted: February 15, 2001

Filed:   June 15, 2001

_____

Before RICHARD S. ARNOLD and HANSEN, Circuit Judges, and DAVIS,[1] District
    Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

Plaintiffs, Stanley D. Dowd and Richard Brown, Jr., filed suit against the United
Steelworkers of America, Local 286, pursuant to Title VII, 42 U.S.C. § 2000e *et seq.,*
and 42 U.S.C. § 1981, alleging racial discrimination.  A jury returned a plaintiffs'

_____

[1]The Hon. Michael J. Davis, United States District Judge for the District of
Minnesota, sitting by designation.

verdict, and the union appeals the District Court's[2] denial of its motion for judgment as a matter of law.  We affirm.

I.

We consider the evidence produced at trial in the light most favorable to the plaintiffs, the verdict-winners.  See Ogden v. Wax Works, Inc., 214 F.3d 999, 1002 (8th Cir. 2000).  The union is the bargaining representative for 1,400 employees at Goodyear Tire & Rubber Company's plant in Lincoln, Nebraska.  In April of 1997, the union went on a strike which lasted three weeks.  During the strike, the president of the union, Hugh Bowen, was out of the state participating in negotiations with Goodyear. The vice president of the union, John Shotkoski, was in charge of the day-to-day strike activity.

A couple of days after the strike began, Mr. Dowd and Mr. Brown crossed the picket line.[3]  It is our duty to set out what occurred, notwithstanding the ugliness of the language.  Mr. Dowd testified that, at first, when he and Mr. Brown drove across the picket line, seven to ten picketers would shout "scab," "fucking scab," and "motherfucking scabs" at them. Tr. at 17.  He also testified that the picketers shouted "your days are numbered," and "you're wrong for doing this." Id.  Mr. Dowd stated that later on in the week, the picketers began to shout "nigger scab," "black fucking scab," and "motherfucking scab" as he and Mr. Brown crossed the picket line.  Tr. at 18.  Although Mr. Dowd testified that he saw union stewards on the picket line when such slurs were shouted, he did not remember whether any steward shouted the slurs. Mr. Dowd also stated that he saw Mr. Shotkoski off to the side of the picket line as he

---

[2]The Hon. Lyle E. Strom, United States District Judge for the District of Nebraska.

[3]The plaintiffs are not union members, but they are members of the bargaining unit.

drove out of the plant, but he could not recall whether any racial slurs were shouted while Mr. Shotkoski was present. Mr. Dowd complained about the harassment to Goodyear's management. A member of Goodyear's management approached Mr. Shotkoski with concerns over the conduct on the picket line. Mr. Shotkoski drafted and circulated a notice ordering the verbal abuse, as well as the use of obscenities and gestures, to stop.[4]

Mr. Brown testified that he and Mr. Dowd were called "nigger scabs," "niggers," and "boys" by the picketers as they drove through the picket line. Tr. at 209-11. Mr. Brown also stated that he saw a union steward on the picket line on three occasions, and that on one of those occasions the steward called him "nigger" and spat on his car window. Tr. at 213.

After the strike ended, the plaintiffs were subjected to more harassment. Mr. Dowd testified that in the parking lot, and as he passed through the entranceway to work, other employees would call him "fucking scab," "scab boy," "free loader," and "nigger scab." Tr. at 33. According to Mr. Dowd, union stewards were present during the name-calling. Similarly, Mr. Brown testified that a week after the strike ended, 15 to 25 Goodyear employees stood in the hall as he was leaving work and called him "nigger" and "fucking nigger." Tr. at 217-18. Although Mr. Brown could not identify the source of the remarks, he testified that he saw union stewards standing among those shouting the racial epithets. Both Mr. Brown and Mr. Dowd testified that while at work, employees made announcements over the intercom stating, "scab boy is here at work," "you don't belong here," and "it's time for you to leave." Tr. at 35-36. Moreover, a witness for the plaintiff testified that some of the employees would wear tee shirts with Mr. Dowd's name in the sights of a gun or the word "nigger" written on them.

---

[4]This was the second notice discouraging disorderly conduct issued by Mr. Shotkoski. The first was circulated on the third day of the strike.

Approximately two weeks after the strike, Mr. Dowd called Mr. Bowen, the union's president. Mr. Dowd complained that he was being called "scab" and "fucking scab" by the picketers, and that "it was getting racial too." Tr. at 49. Mr. Bowen instructed the chief steward on Mr. Dowd's shift to report early for work and stop the name calling and the congregating in the entranceway. Mr. Dowd testified that from that point onward the chief steward maintained a presence in the entranceway which kept the employees "off" Mr. Dowd. Likewise, Mr. Bowen held a meeting with every steward and instructed them to use their best efforts to stop the name calling and the congregating in the entranceway between shifts. He also gave the message to the union membership at a general membership meeting.

Goodyear also made efforts to end the harassment, disciplining employees for the name calling and the shouting of racial slurs, and halting the offensive announcements by creating a password system to operate the intercom. The plaintiffs also testified that anti-scab and racially loaded statements were spray painted on various walls in the plant. Once made aware of the graffiti, Goodyear had them removed.

Mr. Dowd testified that the congregating in the entranceway as well as the name calling subsided approximately six to eight weeks after the strike. Similarly, the offensive announcements ceased approximately five to six weeks after the strike. Both Mr. Dowd and Mr. Brown testified that whites who crossed the picket line were not subjected to the same kind of treatment. Moreover, after the strike a witness testified that he overheard Mr. Bowen state, "That nigger Stanley Dowd is a pain in the ass." Tr. at 150.

The plaintiffs filed suit against the union and Goodyear under 42 U.S.C. § 1981 and Title VII, alleging hostile work environment. Goodyear settled before trial. The jury returned a verdict in favor of the union on the § 1981 claim and found for the plaintiffs on the Title VII claim. The plaintiffs were each awarded $10,000 in

compensatory damages for emotional distress. The union filed a motion to "conform the verdict," arguing that its compensatory-damages liability was capped at zero by 42 U.S.C. § 1981a(b)(3)(A), and that it should receive a set-off in the amount of Goodyear's settlement with the plaintiffs.

The District Court held that the union's damages liability was not capped at zero by 42 U.S.C. § 1981a(b)(3)(A). The Court held that the limit on the union's damages liability was determined by the number of its members, not by the number of its employees. The Court also denied the set-off, holding that, as instructed, the jury awarded the plaintiffs damages based solely on the union's conduct. The union then filed a motion for judgment as a matter of law, which the Court denied. This appeal followed.

## II.

### A.

As an initial matter we must address whether the union's appeal is timely. The plaintiffs argue that the union's motion to "conform the verdict," filed 10 days after the jury's verdict, and its renewed motion for judgment as a matter of law, filed after final judgment, afforded it impermissible extensions of time to appeal. We disagree.

Rule 50(b) of the Federal Rules of Civil Procedure provides,

Renewing Motion for Judgment After Trial; Alternative Motion for New Trial. If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than *10 days after entry of judgment . . ..*

(Emphasis ours.) Rule 4(a)(4)(A) of the Federal Rules of Appellate Procedure states that a Rule 50(b) motion halts the time for filing a notice of appeal until the court enters an order on the motion. Here, the Court entered judgment on March 24, 2000. The union filed a timely motion for judgment as a matter of law on April 4, 2000. The Court ruled on the renewed motion on May 3, 2000, which began the 30-day period in which the union had to file a notice of appeal. The union filed its notice on May 30, 2000; thus, the appeal is timely. That the union had previously raised its damages-cap argument in a motion made after the verdict but before the judgment is not important. The period for the filing of a Rule 50(b) motion is measured from the entry of judgment.

B.

On the merits of the appeal, the union argues that the District Court erred in (1) holding it liable for compensatory damages under section 1981a(b)(3)(A), (2) not granting judgment as a matter of law on the plaintiffs' discriminatory-harassment claim, and (3) not allowing the union a set-off in the amount of Goodyear's settlement with the plaintiffs. We address each assignment of error in turn.

First, the union argues that its liability for compensatory damages under 42 U.S.C. §1981a(b)(3)(A) is zero. A district court's interpretation of a statute is subject to de novo review. Davey v. City of Omaha, 107 F.3d 587, 591 (8th Cir. 1997).

> [O]ur starting point in interpreting a statute is always the language of the statute itself. If the plain language of the statute is unambiguous, that language is conclusive absent clear legislative intent to the contrary. Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end. If, on the other hand, the language of a statute is ambiguous, we should consider "the purpose, the subject matter and the condition of affairs which led to its enactment." When the meaning of a statute is questionable, it should be given a

sensible construction and construed to effectuate the underlying purposes of the law.

United States v. McAllister, 225 F.3d 982, 986 (8th Cir. 2000) (quoting United States v. S.A., 129 F.3d 995, 998 (8th Cir.1997), cert. denied, 523 U.S. 1011 (1998)) (internal citations omitted).

42 U.S.C. § 1981a(b) provides in relevant part;

(3)    Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party--

(A)    in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

42 U.S.C. § 1981a(b)(3)(A).    The union argues that "respondent" under § 1981a(b)(3)(A) is defined just as it is in 42 U.S.C. § 2000e(n) — as "an employer, employment agency, labor organization," and so forth.  The union claims that, at most, it has only four employees; therefore, under the plain language of the statute its compensatory damages must be capped at zero.  While the union's interpretation of the statute is possible, it is not the only possible one.  Looking to the statute's other provisions dealing with labor unions, as well as to Congress's intent, we think it more likely that the award of $20,000 in this case is within the limits Congress intended to make permissible.

It is undisputed that Congress intended Title VII to cover labor unions. See 42 U.S.C. § 2000e(d)-(e). However, whether a labor organization is covered by Title VII depends upon the number of members it has. See 42 U.S.C. § 2000e(e) (if the labor union is not a hiring hall, it is covered by Title VII if it has 15 or more members). The union concedes that it is covered by Title VII, because it has more than 15 members. Many labor organizations have fewer than 14 employees but thousands of members. Under the union's interpretation of § 1981a(b)(3)(A), even if such labor unions intentionally discriminate, they may not be liable for punitive damages, "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses . . .." 42 U.S.C. § 1981a(b)(3).

We do not believe the union's interpretation comports with Congress's intent and purpose in amending 42 U.S.C. § 1981. After finding that additional federal remedies were needed to deter unlawful harassment and discrimination, Congress amended 42 U.S.C. § 1981 "to provide appropriate remedies for intentional discrimination and unlawful harassment in the workplace." Civil Rights Act of 1991, Pub. L. No. 102-166, § 3. Title VII applies only to employers with 15 or more employees. See 42 U.S.C. § 2000e(b). Thus, every employer covered by Title VII can be liable for at least some amount of compensatory damages under 42 U.S.C. § 1981a(b)(3)(A). The union's interpretation of the statute would create the anomalous result of having a labor union liable under Title VII, but, unlike every employer covered by Title VII, exempt from any compensatory-damages liability. We do not believe it was Congress's intent to treat labor unions and employers so disparately.

The District Court's conclusion that the union's liability is not capped at zero is persuasive. The District Court reasoned that Congress's decision to enact statutory limitations on compensatory damages was a policy decision to protect small employers from enormous compensatory-damages verdicts. The maximum amount of damages for which an employer could be liable is determined by the employer's resources, of which size is an indication. The best way to determine an employer's size is to

ascertain the number of employees it has. However, the number of a union's employees is an inaccurate gauge of its size and resources, as Congress itself recognized in describing what labor unions would be subject to Title VII. A truer indication of a union's size and resources is the number of members it has. Accordingly, a union with 1,400 members would not be exempt from any compensatory damage liability. Thus, we hold that the union's compensatory damage liability is not capped at zero under 42 U.S.C. § 1981a(b)(3)(A). What caps, if any, apply to unions is a question we need not decide. The award of $20,000 made in this case is well within the lowest tier ($50,000) specified by the statute. We decline to insert the definition of "respondent" in §2000e(n) mechanically into the damages-cap provision in § 1981a(b). Words should be interpreted according to their content and in furtherance of the statutory purpose — here, to allow damages within certain limits. It makes no sense to use the numbers of employees as the criterion for damages caps in union cases, when the very question whether the statute covers a given union turns on numbers of members. Congress could make such a choice if it wished, but we are not persuaded that it has done so. We note, in addition, that if § 1981a(b) is read with absolute literalness, there would be no damages cap in this case. A union with 14 or fewer employees, but which is subject to Title VII because it has 15 or more members, is simply not among the classes of "respondents" listed in the damages-cap provision.

Next, we consider whether the District Court erred in denying judgment as a matter of law to the union on the plaintiffs' discriminatory-harassment claim. We review de novo a district court's denial of a motion for judgment as a matter of law. Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998). We will reverse a district court if, after reviewing all the evidence in the light most favorable to the non-moving party and assuming all conflicts were resolved in the non-moving party's favor, and giving to the non-movant the benefit of all reasonable inferences, we "determine that no reasonable juror could have returned a verdict in the non-moving party's favor." Goff v. Bise, 173 F.3d 1068, 1073 (8th Cir. 1999).

Title VII of the Civil Rights Act of 1964 prohibits discrimination against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . .." 42 U.S.C. § 2000e-2(a)(1). "Harassment affects a term, condition, or privilege of employment if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Howard v. Burns Bros., Inc., 149 F.3d 835, 840 (8th Cir. 1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21(1993)). To succeed in a hostile-work-environment claim the plaintiffs must show: (1) that they belong to a protected group; (2) that they were subject to unwelcome harassment; (3) a causal nexus between the harassment and their membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) (in cases where the harasser is not the plaintiffs' supervisor) that the defendant knew or should have known of the harassment and failed to take proper remedial action. See Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999).

The union contends that the plaintiffs did not carry their burden of showing that they suffered discriminatory workplace harassment. First, the union asserts that the plaintiffs failed to show a causal nexus between their treatment and their membership in a protected class. The union argues that the plaintiffs suffered the harassing treatment not because of their race, but because they crossed the picket line. We disagree.

The evidence at trial showed that racial epithets were shouted at the plaintiffs as they crossed the picket line and in the plant. Racial slurs were directed toward the plaintiffs via the intercom, displayed on tee shirts, and painted on plant walls. See Carter, 173 F.3d at 701 (stating "racial epithets are often the basis for racial harassment claims . . . and may likewise create an inference that racial animus motivated other conduct as well."). Moreover, there was evidence at trial that white employees were not subjected to the same kind or intensity of harassment when they crossed the picket

line or after the strike ended. What is more, there was evidence that the union president used a racial epithet in reference to Mr. Dowd. Consequently, a reasonable juror could have concluded that but for the plaintiffs' race, they would not have suffered such treatment.

Next, the union argues that the plaintiffs did not show that the conduct on the picket line created a hostile work environment, because the conduct did not affect a term, condition, or privilege of employment. According to the union, since the conduct took place on public property in front of the plant instead of inside the plant, during work hours, it could not create "an abusive working environment" under Quick v. Donaldson Co., 90 F.3d 1372, 1378 (8th Cir. 1996). The union places too much importance on the time and place of the offensive conduct instead of the nature and manner of the offensive conduct. The touchstone for a Title VII hostile environment claim is whether "the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " Quick, 90 F.3d at 1378 (quoting Harris, 510 U.S. at 21). Here a reasonable juror could have found that the workplace was permeated with discrimination, ridicule, and insult. The plaintiffs were subjected to racial slurs and threats of physical violence each time they drove into and out of the plant. There was evidence that the picketers threw tacks down in the pathway of the plaintiffs' cars and spat on their car windows. In addition, there was evidence that the plaintiffs were fearful for their personal safety. In effect, the plaintiffs were made to "run a gauntlet of [racial epithets] in return for the privilege of being allowed to work and make a living . . .." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986).

Moreover, the union construes "working environment" too narrowly. The offensive conduct does not necessarily have to transpire at the workplace in order for a juror reasonably to conclude that it created a hostile working environment. We have upheld a jury verdict for a plaintiff in a sexual-harassment hostile-work-environment

-11-

claim where the offensive conduct took place in a hotel, after hours, on a business trip. See Moring v. Arkansas Dept. of Correction, 243 F.3d 452 (8th Cir. 2001). Here, the offensive conduct was in physical proximity to the plant, and, arguably, perpetrated with the intention to intimidate and to affect the working atmosphere inside the plant. Thus, we hold a reasonable juror could have determined that the racial abuse hurled at the plaintiffs as they attempted to go to and from work was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Quick, 90 F.3d at 1378.

Next, the union argues that the plaintiffs failed to prove at trial that Goodyear knew or should have known of the harassment and failed to take proper remedial action. The union asserts that federal employment law presumes that the employer controls the workplace, and therefore it has the responsibility to make sure it is free from harassment. Relying on Carter, the union contends that because Mr. Dowd and Mr. Brown are employees alleging discriminatory employment practices, they may succeed against the union only if they prove that the employer engaged in discriminatory employment practices, and that the union took some affirmative action which either caused these practices or prevented the employer from remedying them. See 173 F.3d at 704. Since the plaintiffs did not prove that Goodyear committed any discriminatory employment practices, the union concludes it can not be liable for hostile work environment. We disagree.

Although it is certain that a union may be liable under Title VII if it "cause[d] or attempt[ed] to cause an employer to discriminate against an individual in violation" of the Act, 42 U.S.C. § 2000e-2(c)(3), Title VII also states, "It shall be an unlawful employment practice for a labor organization — (1) to exclude or to expel from its membership, *or otherwise to discriminate against*, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1) (emphasis ours). Thus the plain language of the statute suggests that unions may be liable for any discrimination, including a claim of hostile work environment.

Carter is distinguishable from the present case. In Carter, we considered a Title VII hostile-work-environment claim in which the plaintiff asserted that both the employer and the union knew she was being racially and sexually harassed by other employees, yet neither took any effective remedial measures. Carter, 173 F.3d at 697-98. We affirmed the district court's grant of summary judgment dismissing the claim against the union. We held that the plaintiff had not produced "evidence to show that the union dealt with her in a discriminatory manner or that it prevented [her employer] from fulfilling any obligations to her." Id. at 704. However, in Carter, the alleged harassing treatment was in no way connected to any separate union activity but was the result of a dispute between the plaintiff and another worker. Here, the harassment was directly connected to a union-sponsored activity — the strike. Second, in Carter, we explicitly noted that there was no evidence of discriminatory animus by the union. Here, there was evidence that at least one union steward participated in the harassment, that others stood silently by as it occurred, and that the union's president exhibited discriminatory animus.

The union also argues that it cannot be liable here because it is not responsible for co-worker conduct. The union argues that it is not responsible for the acts of an employee unless that employee is an agent of the union or unless the union authorized, encouraged, or ratified the specific employee conduct. According to the union, there is no evidence of either in this case. Alternatively, the union argues that there is no evidence that union officers knew that racial epithets were being shouted during the strike, and that, when the union leadership learned of the harassment in the plant, they took effective remedial action.

On the contrary, there is sufficient evidence in the record to allow a reasonable juror to conclude that the union authorized or encouraged the unlawful harassment. Union stewards were present on the picket line and in the entranceway of the plant when the racial slurs were shouted. There is even evidence that one steward shouted a racial epithet at one of the plaintiffs from the picket line. Likewise, there is also

-13-

evidence that the union president was aware of the racial harassment in the plant. Mr. Dowd testified that he informed Mr. Bowen, the union's president, that things were "starting to get too racial." Tr. at 50. Similarly, a witness testified that he talked with Mr. Bowen about the racial harassment in the plant. The same witness also testified that he heard Mr. Bowen state, "[t]his nigger Dowd is a pain in the ass." Tr. at 150. Moreover, a reasonable juror could have determined that the union failed to take the proper remedial actions to end the harassment. There was evidence in the record that the racial harassment continued through most of the strike and lasted approximately six to eight weeks after it was over.

Last, the union asserts that it should receive a set-off in the amount of Goodyear's settlement with the plaintiffs. The union contends that the jury awarded damages for all the emotional distress it believed the plaintiffs suffered as a consequence of the events which the union and Goodyear jointly caused or permitted to happen. The union, as the non-settling defendant, argues it is entitled to have the amount it owes set off by the amount paid by Goodyear. We disagree.

The jury was instructed to render a damages judgment based solely upon what the jury determined to be the union's conduct. The jury instructions stated that if the jury found the union liable, and if it found "from a preponderance of the evidence that either plaintiff suffered emotional distress during or after the strike which was proximately caused by the racially hostile work environment for which [the jury] . . . found defendant Local No. 286 responsible, then [the jury] should award such plaintiff damages for that distress." Joint Appendix (J.A.) 175. Hence, the jury was not instructed to award damages to compensate the plaintiffs for their total injury, but only for the injury of which the union was the proximate cause. Consequently, to allow the union to receive a credit in the amount of Goodyear's settlement would accord the plaintiffs less than a full recovery.

III.

For the foregoing reasons, we hold that the union's compensatory damages are not capped at zero under 42 U.S.C. § 1981a(b)(3)(A), that the District Court did not err in denying the union's renewed motion for judgment as a matter of law, and that the union is not entitled to a set-off.

The judgment is affirmed.

HANSEN, Circuit Judge, dissenting in part and concurring in part.

I respectfully dissent from that portion of subpart II(B) of the court's opinion wherein the court concludes that the statutory term "employees" in 42 U.S.C. § 1981a(b)(3) really means "members" when a labor organization's liability is determined. I readily concur in the balance of the court's opinion.

As outrageously egregious as the evidence supporting the jury's verdict shows the racially motivated conduct of some of the union members and union stewards to have been, and irrespective of how strongly I believe the plaintiffs should be compensated for their emotional distress as an abstract matter of public policy, I believe our inquiry begins, and must end, with the plain language of the damages statute, even though I dislike the result that language compels in this case. As the court notes, "[i]f the plain language of the statute is unambiguous, that language is conclusive absent <u>clear</u> legislative intent to the contrary. Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." <u>United States v. McAllister</u>, 225 F.3d 982, 986 (8th Cir. 2000) (emphasis added). <u>See also</u> <u>Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.</u>, 530 U.S. 1, 6 (2000) ("[W]hen the statute's language is plain, the sole function of the courts–at least where the disposition required by the text is not absurd–is to enforce it according to its terms."). From this, our court concludes that the term "employees" really means

"members" when the damages statute is applied to labor organizations. The court fails, however, to delineate any congressional intent contrary to the plain language of the statute to support its strained construction, let alone any clear intent. In my view, Congress's use of the term "employees" to determine which "respondents" are subject to damages could not be any more clear or unambiguous. Because "the statute is unambiguous on its face, the language of the statute is conclusive as to legislative intent, and we thus [can not] abandon the ordinary . . . meaning" of the term "employees" and replace it with the term "members." United States v. Smith, 35 F.3d 344, 347 (8th Cir. 1994). With all due respect to my brothers' views, the court's "construction . . . defeat[s] the plain language of the statute and [does] not foster any clearly articulated legislative intent to the contrary." Id.

I also respectfully disagree with the court's attempt to define "respondent" as used in § 1981a(b) differently than it is defined by Title VII, § 2000e(n), which defines it to mean "an employer, employment agency, [or] labor organization." "'The interrelationship and close proximity of these provisions of the statute, [§ 1981a(b) and § 2000e,] present[] a classic case for application of the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'" Flandreau Santee Sioux Tribe v. United States, 197 F.3d 949, 952 (8th Cir. 1999) (quoting Comm'r v. Lundy, 516 U.S. 235, 250 (1996)), cert. denied, 530 U.S. 1231 (2000). Section 1981a(b) clearly caps damages based on the number of the respondent's–the labor organization's–employees, not the number of its members.

Congress enacted Title VII in 1964, making labor organizations with at least 100 members liable for discrimination in employment practices. In 1972, Congress amended Title VII to include labor organizations with at least fifteen members within Title VII's reach. See Pub. L. No. 92-261, § 2(4), codified at 42 U.S.C. § 2000e(e). Well aware of how it had defined those labor organizations it had made subject to Title VII as respondents, Congress later enacted the Civil Rights Act of 1991, authorizing

the awarding of compensatory damages and placing caps on those damages based on the number of employees employed by a respondent. See Pub. L. No. 102-166, § 102, codified at 42 U.S.C. § 1981a(b)(3). Irrespective of how much we dislike the outcome, or how we see the equities of the case, we are not at liberty to rewrite the statute. United States v. McIntosh, 236 F.3d 968, 972 (8th Cir. 2001) ("'Courts are obligated to refrain from embellishing statutes by inserting language that Congress has opted to omit.'" (quoting Root v. New Liberty Hosp. Dist., 209 F.3d 1068, 1070 (8th Cir. 2000))), cert. denied, No. 00-1551, 2001 WL 378439 (U.S. May 14, 2001). "Achieving a better policy outcome–if what petitioner urges is that–is a task for Congress, not the courts." Hartford Underwriters, 530 U.S. at 13-14. Congress knew which labor organizations it had previously made subject to Title VII and how it had done so, as well as Title VII's then existing remedies, when it later opted to define the damages caps based on the number of employees a respondent has, not the number of union members in a labor organization already subject to Title VII. It is "natural for Congress to write in like terms" when it intends the same consequences. Johnson v. United States, 529 U.S. 694, 704, 120 S. Ct. 1795, 1803 (2000). Here it did not write in like terms and, in my view, did not intend the same consequences.

Nor does the plain language of the statute create either an absurd result or an anomalous result. Unions with fewer than fifteen employees (but with more than fifteen members) are not the only entity otherwise covered by Title VII exempt from any compensatory damages liability under the statute's plain language. An "employment agency" with fewer than fifteen employees is also exempt from compensatory damages, even though such an employment agency (say a sole proprietorship agency with no employees) is otherwise fully subject to Title VII's requirements and its other remedies. See 42 U.S.C. §§ 2000e(c), (n); 2000e-2(b); 2000e-5(g).

The plaintiffs do not dispute that United Steelworkers of America Local No. 286 had less than fifteen employees. As such, the plain language of the statute mandates that the union's liability for compensatory damages is capped at zero. I would reverse

-17-

the district court's denial of the motion to conform the verdict and order the judgment to be amended to reflect a zero damages award.[5]

I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[1]I note in passing that a recent decision of our court, Daggitt v. United Food and Commercial Workers Int'l Union, Local 304A, 245 F.3d 981 (8th Cir. 2001), held that in the circumstances of that case, union stewards were employees of the union for the purpose of applying the definition of "employer" in § 2000e(b).