United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 96-2393
_____

Beryl Davey, on behalf of herself   *
and others similarly situated,       *
                                     *
          Appellants,                *
                                     *     Appeal from the United
     v.                              *     States District Court for
                                     *     the District of Nebraska.
City of Omaha,                       *
                                     *
          Appellee.                  *

_____

Submitted: December 11, 1996

Filed: February 24, 1997
_____

Before BOWMAN and HEANEY, Circuit Judges, and SMITH,[*] District
Judge.
_____

SMITH, District Judge.

     Following a defendant's verdict on Appellants' claims under 42
U.S.C. § 1983, the District Court[1] ruled for the defendant on

_____

     The Honorable Ortrie D. Smith, United States District
Judge for the Western District of Missouri, sitting by
designation.

     The Honorable Thomas M. Shanahan, United States District
Judge for the District of Nebraska.

Appellants' disparate impact and disparate treatment claims under Title VII. The present appeal involves only the District Court's rulings with respect to the disparate impact claims.[2] For the reasons set forth below, we affirm.

## I. BACKGROUND

The Appellants are a class of 90 library employees employed by the City of Omaha, Nebraska (the "City"). For collective bargaining purposes, City employees are represented by a variety of statutorily created labor organizations; the Appellants are represented by the Civilian Management Professional and Technical Employee Council ("CMPTEC"). Contracts negotiated with CMPTEC typically cover a three year span. In the event of an impasse, either the City or the bargaining unit may file a petition with the Commission of Industrial Relations ("CIR"), which has exclusive jurisdiction over wage disputes involving Nebraska municipalities. In resolving such disputes, the CIR "must establish rates of pay and benefits which are comparable to the prevalent wage rates paid to workers performing the same jobs with employers comparable to Omaha." Neb. Rev. Stat. § 48-818. The CIR has issued guidelines declaring that a city is comparable to Omaha if it is no more than twice as large as Omaha and no less than half the size of Omaha. The CIR has also issued guidelines to aid in determining whether

Appellants have not appealed the jury verdict, nor have they contested the District Court's conclusion that the jury's verdict foreclosed a favorable ruling on their disparate treatment claim.

jobs from other cities are properly comparable to jobs performed in Omaha.

All positions are grouped into classifications. The classifications relevant to this suit are those related to the City's libraries; specifically, the classifications of Librarian I, Librarian II, Librarian III, Library Specialist, Fiscal Specialist, Office Supervisor and Executive Secretary. Tr. at 76.[3] In the past, the City had negotiated across-the-board wage increases to be applied to all classifications represented by CMPTEC. However, in 1986 the City desired to update its job descriptions, institute performance appraisals and a merit pay system, and develop a salary structure with wages that insured fairness and equity both among City employees and with respect to the outside market. Tr. at 54-55, 61, 695; Jt. App. at 23. To this end, the City commissioned a study to be performed by Hay Management Consultants (the "Hay Study"). Negotiations for the 1989-91 contract began in 1988. The City attempted to use the Hay Study as a basis for negotiations, but its use was opposed by CMPTEC. Tr. at 915-16.[4] The focal

---

The class certified by the District Court consisted of all library employees affected by the wage scales at issue in this suit. It should be noted that not all individuals holding the classification of Fiscal Specialist, Office Supervisor and Executive Secretary are library employees and hence are not included in the class. It should also be noted that all employees within these classifications were treated the same, regardless of whether they worked in the library or elsewhere.

The parties and the District Court agreed that the Hay Study's results were irrelevant to the disparate impact claim. Jt. App. at 2-3. However, as discussed later in this opinion, the reason the City commissioned and attempted to use the Hay Study is relevant to the issues presented on appeal.

3

point of these negotiations was benefits; wages were CMPTEC's secondary concern. Tr. at 445-46; 799-800. An impasse developed over this issue, causing CMPTEC to file a petition with the CIR. Tr. at 414-15, 430.

In preparation for the hearing before the CIR, both the City and CMPTEC retained experts to conduct the wage study required by law and the CIR's guidelines. The City hired Robert Otteman, and CMPTEC hired Gary Troutman. Dr. Otteman surveyed the cities of Akron, Tulsa, Colorado Springs, Des Moines, Milwaukee, Kansas City (Missouri), Wichita and Lincoln, as well as Douglas County (Nebraska), the University of Nebraska Medical Center and the State of Nebraska. Troutman studied the cities of Akron, Cincinnati, Colorado Springs, Denver, Des Moines, Kansas City (Missouri), Milwaukee, and Toledo. Although the precise numbers vary, both experts agreed that many of CMPTEC's members (and all members of the class) were paid more than their counterparts in other localities.[5] Faced with this finding from both experts, CMPTEC feared an unfavorable decision from the CIR and withdrew its petition. Tr. at 418-19, 421-22.

As might be expected, the City was encouraged by the experts' findings. As the end of 1989 drew near with no contract with CMPTEC, the City faced three options. The first option was to do nothing; if 1989 ended with no agreement, then the City would have had no obligation to negotiate wages or benefits for that year. Tr. at 422, 812-13, 899. The second option was for the City to

---

Although contested at trial, the accuracy of Otteman's and Troutman's statistical methods and the conclusions drawn therefrom have not been presented as an issue on appeal.

4

file its own petition before the CIR with the expectation that the CIR would order wages decreased for 1989. Tr. at 812-13, 899-900. The viability of this option was based not only on the experts' reports, but also upon the fact that, with respect to a different bargaining unit (Local 251), the CIR had ordered a retroactive decrease in wages. Tr. at 813, 823-24. The City's final option was to continue attempts to negotiate a contract covering 1989-91. Tr. at 813, 900. Ultimately, the City chose to combine options two and three. Tr. at 900-03. The City filed its petition before the CIR in late December 1989; however, an agreement with CMPTEC was still preferred because of the obvious advantages certainty for the ensuing two years would bring. In addition, the City really did not desire to enforce a retroactive wage decrease because of concerns over fairness and morale; even when entitled to do so with respect to Local 251, the City negotiated an alternative that did not require the employees to actually pay money back to the City. Tr. at 823-24.

In early January 1990, the City and CMPTEC resumed negotiations. Instead of the across-the-board wage increase instituted in past years, the City (through its Labor Relations Director, Thomas Marfisi) proposed a series of four groupings, with different wage increases for the classifications within each grouping. Marfisi began by observing that, despite some differences, Otteman's and Troutman's conclusions were substantially the same. Tr. at 854. Marfisi then used Otteman's findings to group the classifications into four categories, based on the degree to which Otteman concluded those classifications were underpaid or overpaid when compared to the midpoint of the maximum salaries of the other employers surveyed. Specifically,

5

Group I consisted of those classifications that were 8% or more above the maximum, Group II consisted of those classifications that were less than 8% above the midpoint, Group III consisted of those classifications that were between the midpoint and 7% below the midpoint, and Group IV consisted of those classifications that were more than 7% below the midpoint. The lines separating the groups were determined by utilizing natural breaks in the percentages. Tr. at 671, 814-16.

All members of the plaintiff class were among those within Group I; thus, though they received a wage increase for the years 1989-91, they received a smaller increase than those classifications in the other three groups. However, the grouping process evidences a disparate impact on women: CMPTEC represents 250 men and 103 women, while the employees in Group I consisted of 79 men and 87 women.

Eventually, CMPTEC agreed to Marfisi's proposal. In July 1990, and over strenuous objection from members of the plaintiff class, the City Council passed an ordinance approving the groupings. The Appellants filed the instant suit in January 1992, alleging that passage of the ordinance violated their civil rights, constituted intentional discrimination, and resulted in a disparate impact on women. The District Court concluded that the Civil Rights Act of 1991 did not apply to this case, and therefore the only claims submitted to the jury were those brought pursuant to 42 U.S.C. § 1983. Following a jury verdict in the City's favor, the District Court determined the jury's verdict was binding with respect to the intentional discrimination claim, but not the disparate impact claim. After finding that the plaintiffs had demonstrated a disparate impact on women, the District Court ruled

in the City's favor because the City had demonstrated a viable business justification for its actions.  This appeal followed.


## II.  DISCUSSION


### A.  Application of the Civil Rights Act of 1991


The first issue that must be addressed is Appellants' claim that the Civil Rights Act of 1991 (the "Act") applies to this case. As this question is a legal issue involving statutory construction, we must conduct a de novo review.  Loehrer v. McDonnell Douglas Corp., 98 F.3d 1056, 1061 (8th Cir. 1996).  Our independent consideration persuades us that § 105 of the Act does not apply retroactively.

Section 105, which is codified at 42 U.S.C. § 2000e-k(1)(A), provides that

> An unlawful employment practice based on disparate impact is established . . . only if --
>
> > (I) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of . . . sex . . . and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or
> >
> > (ii) the complaining party [demonstrates] an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

The Act was Congress's response to a series of Supreme Court decisions; among the decisions specified by Congress was <u>Wards Cove Packing Co. v. Atonio</u>, 490 U.S. 642 (1989), and § 105 "is a direct response to <u>Wards Cove</u>." <u>Landgraf v. USI Film Products</u>, 114 S. Ct. 1483, 1489 (1994). In <u>Wards Cove</u>, the Supreme Court held that a business justification was a practice that "serves, in a significant way, the legitimate employment goals of the employer" and further directed that "the employer carries the burden of producing evidence of a business justification for his employment practice [but that] the burden of persuasion . . . remains with the disparate-impact plaintiff." <u>Wards Cove</u>, 490 U.S. at 659.

In passing § 105, Congress intended to codify the standard enunciated by the Supreme Court in <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971). Although this is not an appropriate case to detail all the differences between <u>Griggs</u> and <u>Wards Cove</u>, it is appropriate to point out that there are significant differences between the two.

> Under <u>Wards Cove</u>, after the plaintiff established a prima facie case of disparate impact, the defendant employer bore the burden of producing evidence of a legitimate business justification in defense of the challenged policy. The burden of persuasion, however, remained on the plaintiff. Under the <u>Griggs</u> standard, the burden is on the defendant employer to prove both a "compelling need" for the challenged policy, and the lack of an effective alternative policy that would not produce a similar disparate impact.

<u>Bradley v. Pizzaco of Nebraska, Inc.</u>, 7 F.3d 795, 797 (8th Cir. 1993); <u>see also</u> <u>Houghton v. Sipco, Inc.</u>, 38 F.3d 953, 958 (8th Cir. 1994).

8

We must begin by examining the language of the Act itself while keeping in mind that "there is no special reason to think that all the diverse provisions of the Act must be treated uniformly for such purposes." Landgraf, 114 S. Ct. at 1505. In presenting their text-based argument, Appellants rely upon § 402 of the Act, which provides as follows:

> (a) Except as otherwise specifically provided, this Act and the amendments made by this Act shall take effect upon enactment.
>
> (b) Notwithstanding any other provision of this Act, nothing in this Act shall apply to any disparate impact case for which a complaint was filed before March 1, 1975, and for which an initial decision was rendered after October 30, 1983.

It seems clear that § 402(b) describes one case and one case only; namely, Wards Cove. See Landgraf, 114 S. Ct. at 1493. Appellants contend that by specifically exempting Wards Cove from the Act's application, and by declaring that, except as provided, the Act was to take effect upon enactment, the Act must apply to all other cases -- including this one. The major flaw in this argument is that the Supreme Court has explicitly rejected it -- twice. Id. at 1494-96; Rivers v. Roadway Express, Inc., 114 S. Ct. 1510, 1514-15 (1994). In rejecting this analysis with respect to § 102 of the Act, the Landgraf Court noted that "[h]ad Congress wished § 402(a) to have such a determinate meaning, it surely would have used language comparable to its reference to the predecessor Title VII damages provision in the 1990 legislation: that the new provisions shall apply to all proceedings pending on or commenced after the date of enactment of this Act," 114 S. Ct. at 1494 (citation

9

omitted).[6]  The <u>Rivers</u> Court, when presented with the same argument with respect to retroactive application of § 101, noted that the argument "is no more persuasive as to the application of § 101 to preenactment conduct than as to that of § 102."  114 S. Ct. at 1514.

The above reasoning applies with equal force to § 105.  Had Congress intended for § 105 to apply retroactively, it would have said so clearly and directly: just like it did in Title VII.  Given the important considerations involved in deciding to apply a statute retroactively, we do not believe Congress would have employed such tortured language to achieve this result.  <u>See</u> <u>Landgraf</u>, 114 S. Ct. at 1495.

Appellants acknowledge <u>Landgraf</u>'s holding, but contend it should not apply in this case because it would render § 402(b) meaningless.  However, as <u>Landgraf</u> explains, "[i]t is entirely possible -- indeed, highly probable -- that, because it was unable to resolve the retroactivity issue with the clarity of the 1990 legislation, Congress viewed the mater as an open issue to be resolved by the Courts. . . . The only matters Congress did *not* leave to the courts were set out with specificity in §§ 109(c) and 402(b)."  <u>Landgraf</u>, 114 S. Ct. at 1494-95 (emphasis in original).

---

"In 1990, a comprehensive civil rights bill passed both Houses of Congress.  Although similar to the 1991 Act in many other respects, the 1990 bill differed in that it contained language expressly calling for application of many of its provisions, including the section providing for damages in cases of intentional employment discrimination, to cases arising before its (expected) enactment.  The President vetoed the 1990 legislation, however, citing the bill's 'unfair retroactivity rules' as one reason for his disapproval."  <u>Landgraf</u>, 114 S. Ct. at 1491-92 (footnote omitted).

Rejecting Appellants' argument does not render § 402(b) meaningless.

Having concluded that Congress did not specifically declare that the Act is to apply retroactively, "we must consider whether the new statute would have a true retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" Maitland v. University of Minnesota, 43 F.3d 357, 361 (8th Cir. 1994) (quoting Landgraf, 114 S. Ct. at 1505) (footnote omitted). A statute is not retroactive merely because it applies to conduct that occurred prior to the statute's enactment; "[t]he conclusion that a particular rule operates 'retroactively' comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." Landgraf, 114 S. Ct. at 1499. Given the broad effect of § 105, it cannot be characterized as simply a procedural change. Generally speaking, § 105 reallocates and raises the burden of persuasion with respect to a business justification defense and redefines precisely what constitutes a valid business justification. It seems clear, then, that application of § 105 would attach new legal consequences to employment decisions made prior to its enactment, rendering impermissible certain acts that were previously permissible and giving employers different issues to consider when making decisions. We have no difficulty concluding that § 105 attaches new consequences to prior conduct and significantly alters the

11

legal terrain that employers must traverse. Consequently, we hold that § 105 does not apply retroactively.[7]

## B. Disparate Impact Analysis

The employment decision attacked by the Appellants is the City's decision to place all classifications within the four groupings; Appellants have specifically declared that this, not the decisions regarding the amount of raise to award on an annual basis, is the practice they challenge. The District Court found that the groupings had a disparate impact on women, and the City has not appealed that determination.

Once a plaintiff has demonstrated that an employment practice has a disparate impact, the employer is called upon to offer a business justification for the practice. "This phase of the disparate-impact case contains two components: first, a consideration of the justifications an employer offers for his use of these practices; and second, the availability of alternative practices to achieve the same business ends, with less [discriminatory] impact." Wards Cove, 490 U.S. at 658. A valid

---

As an alternative argument, Appellants contend that the City's violation was continuing in nature, thereby permitting retroactive application of § 105 under the facts of this case. We disagree for two reasons. "We are not familiar with any Eighth Circuit law where the concept of continuing violation, ordinarily associated with statutes of limitations issues, has been employed to overcome a non-retroactivity rule." Caviness v. Nucor-Yamato Steel Co., No. 95-3482, slip op. at 8 n.1 (8th Cir. Jan. 29, 1997). We went on to opine that applying the continuing violation doctrine in this manner would violate Landgraf. Id. We are now bound by our decision in Caviness.

12

business justification describes a business practice that "serves, in a significant way, the legitimate employment goals of the employer." Id. At 659. An insubstantial justification will not suffice, but an employer need not demonstrate that the practice is essential or indispensable. Id. Even if the employer can demonstrate a valid business justification, the plaintiff still has the opportunity to persuade the fact finder that alternative practices would have equally satisfied the employer's interests without creating a disparate impact. "Of course, any alternative practices which respondents offer up in this respect must be equally effective as [the employer's] chosen . . . procedures in achieving [their] legitimate goals." Id. at 661. In determining whether proffered alternatives are equally effective, the fact finder may consider factors such as efficiency, cost, or other burdens associated with the alternative. Id.

Our review of the record demonstrates that the District Court's findings were not clearly erroneous.[8] The District Court found that the City's goal was to create a fair and equitable manner for implementing wage increases for CMPTEC's members. This purpose was described in other portions of the record as a desire to reach a fair and equitable settlement with the union. Appellants do not deny that this is a valid business justification, but rather claim that adoption of the groupings was not motivated

_____

Appellants suggest that the issue of business justification is a mixed issue of law and fact and is subject to a de novo review. We disagree. Wards Cove suggests that the employer must "persuade the trier of fact" to succeed with the defense, Wards Cove, 490 U.S. at 660, and we have previously treated the issue as one of fact. Bradley, 7 F.3d at 798; see also Melendez v. Illinois Bell Tele. Co., 79 F.3d 661, 670 (7th Cir. 1996).

13

by this goal. Appellants contend that the evidence demonstrates that the City's goal was simply to negotiate a contract, but the record belies this contention. The City had no obligation to negotiate 1989's wages, and were in a good position to present a successful petition to the CIR. As things turned out, the City desired to negotiate a contract for 1989-91 if possible, but the record does not demonstrate this to be the sole reason for the groupings that were eventually adopted. As far back as 1986 the City was interested in insuring equity in pay, with equity measured not only internally but also in comparison to what other cities were paying their employees. This is why the Hay Study was commissioned, and this is why the City tried to use the Hay Study during the initial round of negotiations. The testimony of Tom Marfisi describing his reasons for making the proposal that was eventually adopted more than adequately supports the District Court's findings that the groupings were adopted to promote fairness and equity.

Appellants also attack the District Court's finding that the evidence supported the groupings that were adopted and that the groupings promoted the interest of fairness and equity. Relying on Christensen v. Iowa, 563 F.2d 353 (8th Cir. 1977), Appellants contend the studies conducted by Otteman and Troutman were flawed because they examined wages in an artificial market defined by Nebraska statutes and CIR regulations as opposed to wages in the market in which Omaha competes for library employees. Christensen does suggest that wage decisions may be based upon the realities of the market in which the employer must compete for workers. 563 F.2d at 354, 356. However, we disagree with Appellants' contention that the City's decision was based on studies of irrelevant

markets.  We do not base this decision on the simple fact that the decision was based on analysis of the markets described in Nebraska statutes and CIR regulations, but rather because evidence in the record supports the conclusion that the markets studied by Otteman and Troutman are, in fact, the markets that Omaha competes in when hiring library employees.  Tr. at 543-44, 564-66, 585, 717-18, 730-31.

Finally, Appellants dispute the District Court's declaration that they failed to introduce evidence demonstrating the existence of a viable alternative.  Appellants concede that they did not address this issue in their post-trial brief, but contend that they nonetheless presented evidence of three viable alternatives.  However, Appellants were not merely silent in their post-trial brief; Appellants advised the District Court that "an alternative option is not relevant in this case because no business necessity has been demonstrated by Defendant."  Davey v. City of Omaha, No. 8:CV92-00046, slip op. at 23 (D. Neb. Apr. 15, 1996) (quotation omitted).  By telling the District Court that it did not need to discuss alternative options, Appellants abandoned the issue and cannot raise it on appeal.  Kramer v. Kemna, 21 F.3d 305, 308 (8th Cir. 1994) ("Failure to give the district court a first opportunity to decid[e] the merits of an argument constitutes a waiver of that argument.").

Even if Appellants had properly presented the issue to the District Court for consideration, we do not believe the outcome of this case would be different.  The first alternative, an across the board increase equally applied to all CMPTEC members, is not viable within the meaning of Wards Cove because it does not promote the City's goal of moving wages closer to those paid in comparable

15

cities.  The second alternative, implementation of the Hay Study's recommendations, is curious in light of testimony from one of the Plaintiffs that the recommendations would have an "adverse impact" on library employees.  Tr. at 82.  Furthermore, although the Hay Study did conclude that there was less "internal equity" with respect to library positions, the Hay Study reached the same conclusion as did Otteman and Troutman  in concluding that library employees were paid above employees with similar duties in other cities.  Tr. at 711.  Appellant has not pointed to any portion of the record that demonstrates that the Hay Study would have both (1) had a less disparate impact and (2) equally satisfied the City's goals when compared to the plan that was adopted.  Cf. Wards Cove, 490 U.S. at 660 (burden of persuasion with respect to viability of alternatives rests with plaintiff).  Finally, Appellants surrendered the opportunity to rely on the Hay Study when they represented to the District Court that "the Hay Study is irrelevant to Plaintiffs' disparate impact claim and . . . that the plaintiffs [sic] have never claimed that the Hay Study supports [the disparate impact] part of their case."  Jt. App. at 3.

Appellants' third and final suggested alternative was for the City to divide the groupings in different manners or utilize a different number of groupings.  The record demonstrates the groupings were made by listing the various job classifications in order of the degree to which their wages were over or above the average median wages from other cities, and the lines were drawn in natural breaks in those percentages.  Appellants speculate that alternative groupings would have been as or more effective at achieving the City's goal of external equity; however, as with the other proffered alternatives, they have failed to identify any

16

evidence demonstrating that equally viable alternatives would have been equally effective in achieving the City's goals.

## III. CONCLUSION

For the foregoing reasons, the judgment in favor of the City is AFFIRMED.

HEANEY, Circuit Judge, concurring and dissenting.

I concur in Section B of the majority's opinion for the reasons stated therein. I disagree, however, with the majority's conclusion that Section 105 of the Civil Rights Act of 1991 is not retroactive. Assuming retroactivity, I nonetheless believe that the librarians' claim under the Civil Rights Act fails for the same reasons they did not succeed under Section 1983.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

17