Virginia ARTHUR and Wendy Klepetar

v.

THE COLLEGE OF ST. BENEDICT; and The Order of St. Benedict, d/b/a St. John's University

No. 98–CV–01959.

United States District Court, D. Minnesota.

Oct. 1, 2001.

Christopher John Sorenson, Robins Kaplan Miller & Ciresi, Minneapolis, MN, Diane Bolt Bratvold, Fetterly & Gordon, Minneapolis, MN, Gary Jeffrey Gordon, Rider Bennett Egan & Arundel, Minneapolis, MN, Stephen Michael Warner, O'Neill & Murphy, St Paul, MN, for plaintiffs.

Daniel Gerard Wilczek, Kristen M. Ludgate, Faefre & Benson, Minneapolis, MN, for defendants.

## ORDER

ROSENBAUM, District Judge.

The College of St. Benedict and St. John's University are located near St. Cloud, Minnesota. When the College of St. Benedict was founded, it was an institution for the education of young women, and had a predominantly female faculty. St. John's University, in contrast, was founded as an institution for the education of young men, with a predominantly male faculty. Each was founded by a separate religious order—St. Benedicts by the Order of St. Benedict's, and St. John's by the brothers of St. John's Abbey, a Benedictine Order.

The two schools are among Minnesota's well-known and highly respected Catholic institutions of higher learning. In 1997, the schools merged and amalgamated their teaching faculties. Notwithstanding this realignment, each school remains separately managed by the religious Order which created it, and each maintains its own financial base, including its own endowment.

Plaintiffs are professors at the colleges and claim they have suffered discrimination based upon their gender.

Prior to the coordination of the two faculties, each college offered separate employee benefit programs. This case concerns particular differences which existed in the post-secondary tuition remission educational benefits available at the individual colleges. Each professor has been grandfathered into the tuition remission benefit he or she had prior to the faculty merger. Alternatively, they may elect to participate in the new tuition remission benefit program offered to newly hired faculty members. Plaintiffs claim this situation has had a discriminatory effect upon them.

This matter is now before the Court on defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, defendants' motion is granted.

I.  *Background*

Prior to the faculty merger, plaintiffs were professors at the College of St. Benedict. Wendy Klepetar was hired as a full-time professor in management in 1984. [Christopher J. Sorenson Aff., Ex. A, at 135.] Virginia Arthur was hired as a full-time professor in management in 1985. [Sorenson Aff., Ex. B, at 70.] At the time they were hired, and every spring thereafter, they signed a "continuous contract." This contract incorporated by reference the St. Benedict's Faculty Handbook, which set out their employment benefits. [Sorenson Aff., Ex. Q.] Defendant College of St. Benedict ("St.Ben's") is the plaintiffs' original employer.

Both plaintiffs claim they have suffered, and continue to suffer, from discrimination at the defendants' hands. Their complaint has its genesis in the period prior to the faculty merger when the schools were entirely separate. Each college had its own academic program and its own separately hired faculty. Each college also had its own employee benefit program, applicable to its particular staff or faculty. The differences between the two schools' tuition remission benefits underlie the present action.

From their founding, and through the present day, each college has maintained its own Board of Directors, its own separate ties to the religious orders under whose auspices each operates, and—importantly—its own funding and endowment through its respective order. [Ludgate Aff., Ex. U; Ex. W.] St. Ben's endowment is $17 million, while St. John's is $98 million—almost six times larger. [Ludgate Aff., Ex. V, ¶ 8; Ex. U, ¶ 20.] Neither institution draws upon the other's fiscal resources, nor have they pooled their separate endowments. [Ludgate Aff. Ex. V; Ex. W, Ex. U.]

While these important financial and administrative differences have continued, the schools have coordinated and combined their educational programs. By the 1970s, most instructional departments at the colleges were combined under a single department chair. [Sorenson Aff., Ex. KK, at 2.] As part of this process, the students take classes in either school interchangeably, with one school or the other having a department whose courses are required for the student's academic program. [Ludgate Aff., Ex. U.] Although the ratio of male to female faculty at St. Ben's has been about 50–50, St. John's faculty has historically had a larger proportion of males.

In 1993, on a trial basis, St. John's and St. Ben's adopted principles of coordinate governance. [Janzen Aff, Ex. 2.] Since that time, the coordinated academic faculty has been hired into an essentially unified

academic program jointly administered by the two institutions. Faculty are now simply "assigned" to one school or the other. Newly-hired staff of the coordinated institutions enjoy uniform employee benefits.

As a part of their claim, plaintiffs allege that the now-closely-aligned colleges have effectively become one school, and should, perforce, be considered a joint employer.[1]

### A. The Problem

Prior to the coordination of their faculties, each college offered separate employee benefit programs. The dispute in this case concerns the tuition remission benefit programs available to plaintiffs. Under these programs, the employing college provides tuition assistance to eligible dependents of their respective faculties and staff.

### 1. The St. Ben's Plan—Pre–Merger

Up until 1997, St. Ben's provided a tuition remission employee benefit to all full-time employees, whether academic or other college staff, after completion of one year of service. Under the St. Ben's plan, each of the employee's eligible dependents received free tuition at either St. Ben's or St. John's. The benefit "vested" over time, so that the even if the employee left St. Ben's service after 20 years, the benefit was retained.

### 2. The St. John's Plan—Pre–Merger

St. John's offered its own tuition remission plan available only to dependents of its faculty members—as opposed to its non-academic staff—who had completed three years of qualified service. For its faculty members, St. John's offered a "portable" tuition remission benefit. Under this plan, an eligible dependent could attend any institution of higher education and receive the equivalent of one year's tuition at St. John's, which could be applied to the tuition of a more expensive institution.[2]

### 3. The New Plan

As the two college faculties merged, virtually all of their employee benefits were equalized, with the exception of the tuition remission benefit. This benefit was the subject of a heated debate between faculty and administration. [Sorenson Aff., Ex. K, Ex. L, Ex. M.] Notwithstanding extensive discussion, the schools' Boards and faculties could not amicably resolve the question of which faculty and staff tuition remission package should be available to the faculty hired prior to the "merger." [Sorenson Aff., Ex. V, at 36–7.]

The combined faculty, not unexpectedly, desired St. John's more expansive tuition remission plan for the pre–1997 faculty. The Coordinate Finance Committee ("CFC")[3] did not concur, finding the cost of extending the St. John's benefit to the

---

**1.** St. John's and St. Ben's vociferously dispute this point, but purely for the purposes of this motion, they accept plaintiffs' view. They do so, of course, because Rule 56 of the Federal Rules of Civil Procedure requires the Court to resolve all factual disputes in favor of the non-moving party. *Radaszewski v. Telecom Corp.,* 981 F.2d 305, 310 (8th Cir.1992), *cert. denied,* 508 U.S. 908, 113 S.Ct. 2338, 124 L.Ed.2d 248 (1993). The Court, therefore, assumes St. John's and St. Ben's are now a joint employer.

**2.** As an example, in the 1999–2000 academic year, this benefit had a maximum value of $16,195.00.

**3.** The CFC is made up of Board members from each institution who oversee and discuss issues of common interest. [Ludgate Aff., Ex. U, at ¶ 5.]

entire faculty to be exorbitant. [Ludgate Aff., Ex. U.] [Janzen Suppl. Aff., Ex. F.] The CFC did, however, agree that, for legal and ethical reasons, the pre-existing benefit could not be eliminated from St. John's faculty that had relied on it. [Ludgate Aff., Exhibit W, ¶ 11.]

Finally, on October 24, 1997, in the absence of an agreement, the CFC imposed a solution: the St. John's faculty and staff who were hired prior to July 1, 1998, were eligible to retain the tuition remission benefit under which they had been hired.[4] The combined faculties hired prior to July 1, 1998, along with those hired thereafter, were eligible to receive a new "tuition consortium benefit." [Sorenson Aff., Ex. CC.] This new benefit provided an enhanced tuition remission benefit for St. Ben's faculty, providing the possibility of enrolling tuition-free at approximately 400 participating colleges across the country. [Ludgate Aff., Ex. N.]

### B. Statistical Evidence

According to plaintiffs' statistical expert, Frank B. Martin, the two schools employed 179 lay faculty during the 1997–1998 period. [Sorenson Aff, Ex. GG, at 1.] Of this number, 89 held St. John's contracts, and 90 were at St. Ben's. St. John's faculty was 76% male (68 out of 89), compared to 47% male at St. Ben's (42 out of 90). Id. Only those St. John's faculty members who had been hired before July 1, 1998, were eligible for the traveling tuition remission benefit. Id., ¶ 4. During the 1997–98 period, 62% of the combined colleges' male faculty (or 68 out of 110) received the traveling tuition remission benefit, while only 30% of the combined female faculty of the colleges (or 21 out of 69 females) received the benefit. Id. According to the expert, a gender-blind benefit distribution would be expected to yield approximately 34.4 female faculty receiving benefits, as opposed to the 21 who were observed to have done so. Id. The expert concluded that this difference was statistically significant, amounting to four standard deviations. Id.

Mr. Martin also analyzed new hires between 1992–1997.[5] Of these, 54% of St. John's newly-hired male faculty received a St. John's contract, compared to 22% of the newly hired female faculty receiving a St. John's contract. He concluded that this was "statistically significant and is equal to 2.2 standard deviations," concluding that the probability of this occurring simply by chance is approximately .022. Id.

Plaintiffs filed this lawsuit alleging sex discrimination in violation of Title VII, premised on a disparate impact theory. They further claim violations of the Equal Pay Act ("EPA") and the Minnesota Human Rights Act ("MHRA").

### II. Analysis

Defendants seek summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiffs oppose the motion. Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liber-

---

4. The St. Ben's faculty were also "grandfathered" into their previous tuition remission plan. [Ardolf Supp. Aff., ¶ 13.]

5. There is a dispute between the two plaintiffs as to when St. Ben's and St. John's became a joint entity. While one plaintiff contends it was in May, 1996, the other believes it was September, 1994. The expert, on the other hand, has based this portion of his statistical analysis on the years 1992–1997, because of the data available to him at the time.

*ty Lobby, Inc.,* 477 U.S. 242, 246, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. *Id.* at 248–49, 106 S.Ct. 2505; *see also Hartnagel v. Norman,* 953 F.2d 394, 395–96 (8th Cir.1992). If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Mt. Pleasant v. Associated Elec. Coop., Inc.,* 838 F.2d 268 (8th Cir.1988).

### A. Statute of Limitations

■ Defendants first assert plaintiffs' claims are time-barred. They correctly note Title VII's 300–day statute of limitations, the EPA's two year limitation period,[6] and the one year limitation period under the MHRA. *See* 42 U.S.C. § 2000e–5(e)(1); 29 U.S.C. § 255(a); Minn.Stat. § 363.06(3). From these limitation periods, defendants argue plaintiffs were "assigned" to St. Ben's in 1984 and 1985, and claim their Title VII, EPA, and MHRA claims were fatally stale when they commenced this case in December, 1997. The Court finds this defense to be misplaced.

It cannot be denied that each plaintiff was aware of her gender for some time, and certainly each knew the tuition remission program was an issue. But the statute of limitations defense fails because the plaintiffs did not know—and indeed, they could not know—the CFC's decision until it was promulgated on October 24, 1997. Therefore, the Court considers that plaintiffs' claims did not arise when they were hired, but rather when the CFC plan was

put into effect. Until that date, any claim they may have had was inchoate and unripe; their claims did not ripen until defendants' decision to grandfather the traveling tuition remission benefit. Plaintiffs' suit was filed in December, 1997, within 60 days of the properly-placed date on which their claims, if any, accrued. Each of their claims, therefore, fall well within the applicable statute of limitations.

### B. EPA Claims

Moving next to defendants' substantive defenses, they begin by asking for summary judgment on plaintiffs' EPA claim, because any perceived disparity in pay is "based on ... [a] factor other than sex." 29 U.S.C. § 206(d)(1). The EPA requires equal compensation for male and female employees who perform equal work, the performance of which requires equal skill, effort, and responsibility, and which is performed under similar working conditions within an establishment. *Id.* The statute, however, reserves to the employer an affirmative defense if the disparity is based on (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality; or (4) a factor other than sex. *Id.* Defendants, here, premise their defense on the "other than sex" factor.

### 1. Prima facie claim

■ In order to establish their prima facie EPA claim, plaintiffs must show the employer paid male and female employees different wage rates for substantially equal work. *Broadus v. O.K. Indus., Inc.,* 226 F.3d 937, 941 (8th Cir.2000). Plaintiffs offer the differing tuition remission plans afforded faculty of St. John's and St. Ben's to prove their disparate pay claim. The EPA's regulations support plaintiffs' view

---

**6.** This time period is extended to three years for willful violations. 29 U.S.C. § 225(a).

that a disparity in fringe benefits support an EPA claim. 29 C.F.R. § 1620.11.

■ Defendants do not dispute that each college's professors perform approximately equivalent work and receive comparable salaries at each institution. *See* Sorenson Aff., Ex. C, at 76. They do, however, challenge plaintiffs' choice of the male comparator. *See Strag v. Board of Trustees,* 55 F.3d 943 (4th Cir.1995) (holding that an EPA plaintiff must show she has selected an appropriate comparator); *Hofmister v. Mississippi State Dept. Health,* 53 F.Supp.2d 884, 890 (S.D.Miss. 1999) (same).

Plaintiffs have selected male faculty holding pre-July 1, 1998, St. John's contracts as their comparator, clearly because this portion of the St. John's male faculty is the only group with traveling tuition benefits that now differ from their own. Plaintiffs offer no authority in support of their selection. Defendants claim these males are inappropriate comparators because the St. John's and St. Ben's contract holders are sufficiently integrated—that is, there are sufficient men and women within each category of St. Ben's contract holders and St. John's contract holders.

■ The EPA does not require perfect diversity between the comparison classes, but at a certain point, when the challenged policy effects both male and female employees equally, there can be no EPA violation. *See Cole v. Ruidoso Mun. Sch.,* 43 F.3d 1373 (10th Cir.1994). Plaintiffs cannot make a comparison of one classification composed of males and females with another classification of employees also composed of males and females. *See Hofmister,* 53 F.Supp.2d at 890 (noting the absence of legal authority to support compar-

ing a class "composed of men and women with another class of employees also composed of men and women.")

The Court finds that this is just what plaintiffs have attempted to do; they want the Court to compare the St. John's faculty (76% male and 24% female during the relevant time period) to the St. Ben's faculty (47% male and 53% female during the relevant time period). But the Court finds these two classes were sufficiently integrated at the time of the amalgamation of the colleges, which consequently undermines any suggestion that the difference in benefits was based on sex. *See id.*

### 2. *Affirmative defenses-burden shift*

■ If plaintiffs had established a prima facie EPA claim, the burden would shift to the defendants, who would be given the opportunity to show that any pay differential is based on a factor other than sex. *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 719 (8th Cir.2000); *Hutchins v. International Brotherhood of Teamsters,* 177 F.3d 1076, 1081 (8th Cir.1999); 29 U.S.C. § 206(d)(1). Even if plaintiffs had established a proper comparator, their claim would still fail, because defendants have demonstrated that any differences in pay are based on a factor other than sex.

Here, defendants offer the principle of grandfathering as their primary defense. They claim that grandfathering is a "factor other than sex," shielding them from liability. Although grandfathering has not been specifically enumerated in the regulations as a possible defense, defendants liken grandfathering to the recognized concept of "red-circle rates," which has been accepted as a defense under certain circumstances.[7] *See* 29 C.F.R. § 1620.26.

---

7. The Federal Regulations describe two different examples of red-circling. In the first, an employer transfers a long-service employee

who is unable to perform a previously held regular job because of ill health. In such a case, the employer is justified in paying the

Red-circling, generally, is a practice in which an employee is reassigned to a less demanding job, but is continued at the prior rate of compensation enjoyed in the previously held position. *Id.*

Plaintiffs focus on certain distinctions between red-circling and grandfathering. Red-circle compensation is generally reserved to situations where an employee has either been transferred or reassigned. In short, a change in assignment occurs, usually involving either a temporary or long-service employee. Grandfathering, in contrast, generally involves employees who are neither transferred or reassigned. While the Federal Regulations and case law do not explicate all possible examples of the red-circling concept, *see Christiana v. Metropolitan Life Ins. Co.*, 839 F.Supp. 248, 255 (S.D.N.Y.1993) (holding the regulation's enumerated examples are nonexclusive and merely illustrative of situations where red-circling is appropriate), the Court finds that red-circling does not provide the proper analytic in this case.

■ This determination does not, however, conclude the matter. There is another defense that emerges from EPA case law which provides a better analytic by which to consider grandfathering: it can be called "previous employer salary," for want of a better term. *See, e.g., Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir.1982). This concept is conceptually re-

lated to, but remains different from, the red-circle defense. It provides that, under appropriate circumstances, an employer may use a previous employer's rate of compensation to set wages for its new employment. Of course, an employer may not avail itself of this defense to perpetuate a past discrimination. *See, e.g., Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir.1982).

Here, however, there is no allegation that plaintiffs' salaries, when originally set at the separate institutions, were discriminatory or based on sex.[8] Indeed, there is no disparate treatment claim in this case by plaintiffs, and consequently no allegation that the salaries were discriminatory when originally set. It is undisputed that St. John's and St. Ben's treated each faculty member within their separate college the same, regardless of their gender.

It is a fact that each school was, historically, separate, and each was a single-sex institution. But the mere fact that two religious, single-sex colleges have had faculties which were primarily the same gender as their student bodies does not establish discrimination. The difference in benefits between St. Ben's and St. John's has its origins in the different financial resources and approaches to employee compensation. [Ludgate Aff., Ex. V, ¶ 8.] The grandfathering of benefits, at least in

employee his or her present salary, even if it is greater than that which is being paid to opposite gender employees for similar work. § 1620.26(a). In the second example, an employer which temporarily reassigns an employee to either a greater or lesser demanding job may continue to pay the employee the previously-paid salary, unless the other, opposite-sex employees are paid based on a piece rate, or if the reassignment is not actually temporary. § 1620.26(b).

8. Plaintiffs' briefs make clear that they do not contend defendants originally set their salary

and benefits structures discriminatorily. [See Pl. Opp. Memo, p.11, n.6.] Even if they had evidence of such a fact, plaintiffs' potentially discriminatory assignments were made well before the joint employer status coalesced. Thus, it defies logic to say that plaintiffs were discriminated against by receiving St. Ben's benefits, and not St. John's, when they were hired by St. Ben's. Plaintiffs themselves admit they were hired prior to the occurrence of the alleged joint-employer status. [Ludgate Aff., Ex. C, J.]

this case, has not been shown to be based on any past or present discrimination.

■ The EPA's statutory language is explicit. An employer may have a defense if the compensation disparity is made pursuant to "(iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv). Plaintiffs have not offered a compelling reason to reject "grandfathering" as a "factor other than sex." The Court finds that defendants have shown they are entitled to the grandfathering affirmative defense with regard to the traveling tuition remission benefit. 29 U.S.C. § 206(d)(1)(iv). Plaintiffs, in reply, want the Court to allow them to rebut the grandfathering defense as pretextual, citing *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir.1986). In the Ninth Circuit, an EPA claim's elements are virtually indistinguishable from those of a Title VII claim. Other circuits require that the defendant meet its burden regarding its defense of a "factor other than sex" only if it proves that a bona fide business justification exists for that gender neutral factor. *See, e.g., Aldrich v. Randolph Cent. School District*, 963 F.2d 520 (2nd Cir.1992). While the Court has found nothing in Eighth Circuit case law prescribing the elements of this defense, the Eighth Circuit Court of Appeals has stated that "the standard governing a claim of unequal pay for equal work is the same for Title VII and for the Equal Pay Act." *Hutchins v. International Brotherhood of Teamsters*, 177 F.3d 1076, 1080 (8th Cir.1999). Thus, for purposes of this motion, the Court assumes plaintiffs have such a right to attempt to show the proffered defense is a pretext. Nevertheless, the Court finds they have failed to show the proffered defense is pretextual or non-business related.

Whether viewed in terms of pretext or business justification, the Court finds defendants have sufficiently demonstrated that the decision to grandfather the benefits, thus creating an incongruity in benefits, was based on a "factor other than sex." Defendants state they elected to grandfather the traveling tuition benefit for those who held it prior to the "merger" in order "to honor its pre-existing obligations, avoid being sued by its faculty for breach of contract, and avoid the impact on morale that would have certainly followed a decision to take the benefit away from them." [Def. Mem. Summ. J., at 18.]

■ Defendants offer cost as another "factor other than sex." While cost alone is not a legitimate factor, it may be considered as one factor. *See Davey v. City of Omaha*, 107 F.3d 587, 593 (8th Cir.1997). Plaintiff Arthur, herself, concedes cost as a legitimate concern. [Ludgate Aff., Ex. C, at 127.] Plaintiffs do not challenge defendants' statement that expanding the St. Ben's tuition remission program to encompass the terms of the more expansive St. John's program would have cost the lesser-endowed St. Ben's at least $200,000 in 1997–98, with increases each year thereafter.[9] [Ludgate Aff., Ex. M, at 54; Sorenson Aff., Ex. J.]

Indeed, while those who held the St. John's tuition remission benefit prior to the faculty amalgamation have retained it, all new faculty hires at both institutions now receive the new, reduced, benefit. [Ludgate Aff., Exhibit W, at ¶ 1.] Plaintiffs' only reply to this argument is to merely claim that St. Ben's could have afforded this increased benefit by savings

---

9. Defendants further bolster their position that the high cost of this benefit was a factor by demonstrating that they considered eliminating the St. John's benefit irrespective of their decision to deny the benefit to St. Ben's faculty. [Ludgate Aff., Ex. W, at 1.]

from other sources. [Sorenson Aff., Ex. 0.] There is substantial record evidence showing the Board did not agree with that assessment—as shown by their reluctance to continue the traveling tuition benefit for St. John's pre-merger faculty. [Ludgate Aff., Ex. W, at 1.]

Plaintiffs also deny the legitimacy of defendants' expressed concern for its legal obligation to the St. John's faculty. They claim such a concern for the St. John's faculty could not impact a decision respecting St. Ben's faculty. Plaintiffs are incorrect. The St. John's faculty had been hired under contracts providing the traveling tuition remission plan. Any subsequent act which might divest them of this benefit could well be considered ex-post deprivation of a previous contractual right.[10] The Court easily finds that these potential legal and ethical concerns respecting both college faculties are causally related.

Therefore, the Court finds that there is not sufficient evidence upon which a trier of fact could reasonably find for the plaintiffs' EPA claim. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 252, 106 S.Ct. 2505 (1986). Accordingly, defendants' motion for summary judgment as to the EPA claim is granted.

### C. *Title VII Disparate Impact & MHRA*

While plaintiffs have brought claims under both Title VII and the MHRA, the Court analyzes both under the Title VII rubric. *See Mems v. City of St. Paul,* 224 F.3d 735, 738 (8th Cir.2000) (*citing Hanenburg v. Principal Mut. Life Ins. Co.,* 118 F.3d 570, 574 (8th Cir.1997); *Turner v. IDS Financial Servs., Inc.,* 471 N.W.2d 105, 107 (Minn.1991) (holding that, while not bound to follow the federal rule, the Minnesota Supreme Court relies on the principles of Title VII when construing the MHRA)). Additionally, the basic analysis of an EPA suit and a Title VII suit are "essentially the same under either theory." *McKee v. Bi–State Development Agency,* 801 F.2d 1014, 1018 (8th Cir.1986) (*citing Strecker v. Grand Forks Co. Social Service Board,* 640 F.2d 96, 99 (8th Cir.1980)). *See also Euerle–Wehle v. United Parcel Serv.,* 181 F.3d 898 (8th Cir.1999).

In reply to plaintiffs' gender pay discrimination claim, defendants rely on the Bennett Amendment, 42 U.S.C. § 2000e–2h. This statute allows a defendant to avoid liability under Title VII if one of the EPA's affirmative defenses is proven. This Circuit's law supports defendants' view, holding that an "employer may escape liability if one or more of the four affirmative defenses in the Equal Pay Act, *incorporated into Title VII,* are proven." *McKee v. Bi–State Dev. Agency,* 801 F.2d 1014, 1019 (8th Cir.1986) (emphasis added).[11] Plaintiffs, however, deny this applies to disparate impact claims.

---

**10.** Indeed, the record shows that legal opinions were sought, at least one of which stated that St. John's could be liable to such a claim. [Second Supp. Janzen Aff., Ex. A.] Plaintiffs, themselves, acknowledge the St. John's faculty's likely contractual right to the continued benefit. [Ludgate Aff., Ex. C, at 49; Ludgate Aff., Ex. J, at 83.]

**11.** Here, defendants also cite *Washington v. Gunther,* 452 U.S. 161, 168, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). The Supreme Court was not crystal clear in *Gunther.* It did not

directly confront the effect of the Bennett Amendment in a Title VII disparate impact sex discrimination case where the defendant asserted an "other than sex" defense under the EPA. *See id.,* at 171, 166 n. 8, 101 S.Ct. 2242 (stating that "we are not called upon in this case to decide whether respondents have stated a prima facie case of sex discrimination under Title VII," but just to decide "whether respondents' failure to satisfy the equal work standard" of the EPA "precludes their proceeding under Title VII").

■ The Court need not attempt to divine a definitive ruling on the Bennett Amendment "defense" in disparate impact cases. Plaintiffs' claims fail for a more substantive reason: they cannot survive traditional Title VII analysis, which begins with the familiar McDonnell Douglas/Burdine test. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Plaintiffs must establish a Title VII disparate impact prima facie claim. To do so, they must show: (1) an identifiable, facially-neutral policy or practice; (2) a disparate effect on members of a protected class; and (3) a causal connection between the two. *Mems v. City of St. Paul,* 224 F.3d 735, 739 (8th Cir.2000). Once a plaintiff has established a prima facie case, the employer bears the burden to show the challenged practice is job related and consistent with business necessity. *See* 42 U.S.C. § 2000e–2(k)(1)(A).

### 1. *Prima facie case*

Plaintiffs challenge the decision to grandfather the traveling tuition remission benefit for professors holding St. John's contracts prior to 1998. Plaintiffs' case is based entirely on the statistics of their expert, which the Court considers to be flawed. Here, the Court notes that a portion of the expert's statistics are premised on the original hiring decision which assigned professors to one college or the other. But this would call for a discriminatory assignment claim, and none has been asserted here. As a result, these particular statistics are irrelevant to this case, and the Court disregards them. The remaining statistics merely reflect the existing faculty compositions during the pre-merger and merger time periods. Without a discriminatory assignment claim, they add little to the analysis.

■ The decision to eliminate the traveling benefit and grant an exception to St. John's contract holders had no disparate impact, since both male and female St. John's faculty were grandfathered equally.[12] Plaintiffs, St. Ben's contract holders, were never eligible for the traveling benefit. Thus, their attempt to compare themselves to faculty members at St. John's is improper. The joint colleges treated each St. John's faculty member—male or female—the same. It is equally undisputed that the joint colleges treated each St. Ben's faculty member—male or female—the same. Each employee was eligible for the benefit they had received prior to the merger of the faculty benefits, or the new benefit being offered to new hires.

### 2. *Business necessity*

■ Even if plaintiffs established a prima facie case, defendants have put forth sufficient evidence to show that any differences in tuition remission benefits were based on business necessity, as discussed in the preceding EPA analysis. "A valid business justification describes a business practice that serves, in a significant way, the legitimate employment goals of the employer." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 658, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Courts consider "efficiency, cost, or other burdens associated with the alternative" in evaluating business necessity and the presence or absence of effective alternatives. *See Davey v. City of Omaha,* 107 F.3d 587, 593 (8th Cir.1997). Defendants are unchallenged when they assert that the CFC chose to

---

12. Likewise, plaintiffs were eligible to be "grandfathered" into the St. Ben's 20–year benefit if they so chose. St. John's faculty members and the future hires were not eligible to do so. [Ardolf Supp. Aff., ¶ 13.]

grandfather the tuition benefit to those who held it prior to the "merger" in order "to honor its pre-existing obligations, avoid being sued by its faculty for breach of contract, and avoid the impact on morale that would have certainly followed a decision to take the benefit away from them." [Def. Mem. Summ. J., at 18.] Again, the Court finds it easy to determine the legal and ethical concerns of the administration were legitimate and causally related to its decision.

Defendants, likewise, list cost as a significant concern in their decision-making process.[13] *See Davey*, 107 F.3d at 593 (cost is a factor to be considered in evaluating business necessity.) Plaintiff Arthur concedes cost as a legitimate concern. [Ludgate Aff., Ex. C, at 127.] Plaintiffs do not refute that expanding the St. Ben's tuition remission program to the scope of the St. John's benefit would have cost St. Ben's at least $200,000 in 1997–98, with increases each year thereafter. [Ludgate Aff., Ex. M, at 54; Sorenson Aff., Ex. J.] New faculty hires for both institutions now receive the new, less expensive benefit. [Ludgate Aff., Exhibit W, at ¶ 1]. St. Ben's determined it could not afford to offer a traveling tuition benefit. [Ludgate Aff., Ex. B, Ex. 7.] The plaintiffs' bald assertion that the cost could be absorbed by savings on other programs is too vague to meet the defendants' arguments. [Sorenson Aff., Ex. 0.] To the contrary, the Court finds ample evidence to show the Board's active consideration of withdrawing this costly benefit from St. John's pre-merger faculty. [Ludgate Aff., Ex. W, at 1; Ardolf Supp. Aff. ¶¶ 2–10 and Exs. A–C.]

In this same vein, defendants have offered no evidence to refute the Board's contention that St. Ben's did not have sufficient net revenue in its operating budget to pay for the broader traveling tuition remission benefit. [Ardolf Supp. Aff., Ex. A–C.] The fact that the two schools are now amalgamated does not support plaintiffs' assertion that their combined funding was sufficient to support the more generous traveling tuition benefit. While defendants have conceded they are a joint employer for purposes of this motion, their merger for the purpose of faculty hiring and management does not prove they are so entangled that each entity's assets are now available to the other for any purpose. *See NLRB v. Browning–Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3rd Cir. 1982) (holding that the " 'joint employer' concept recognizes that business entities involved are in fact separate but . . . they share or co-determine those matters governing the essential terms and conditions of employment").

Even if an employer can demonstrate a valid business justification, a plaintiff may demonstrate that an alternative practice would have equally satisfied the employer's interests without creating a disparate impact. "Of course, any alternative practices which respondents offer up in this respect must be equally effective as [the employer's] chosen . . . procedures in achieving [their] legitimate goals." *Wards Cove*, 490 U.S. 642, 661, 109 S.Ct. 2115.

Plaintiffs' only proposed alternative is to provide the traveling benefit to St. Ben's faculty, hired prior to 1998, on the same basis as provided to the grandfathered St. John's faculty. This alternative would have done nothing to ameliorate the legitimate cost concerns of providing the benefit. St. Ben's was already in a cost-cutting

---

13. Additionally, defendants offer the business interests of moving toward uniform benefits for all employee groups, and the potentially devastating effect on faculty morale if the traveling benefit was eliminated altogether.

environment, and did not have sufficient net revenue in its operating budget to pay for the benefit. [Ardolf Supp. Aff., Ex. A–C.] Additionally, creating a special benefit for pre–1998 faculty members only would undermine St. Ben's uncontroverted institutional goal of providing uniform benefits to all employees, faculty, and staff. This alternative proposal would not have been equally effective in achieving the defendants' legitimate goals.

Accordingly, the Court finds defendants have satisfied their burden of proving business necessity, and thus, summary judgment is granted for defendants on plaintiffs' Title VII and MHRA claim.

### III. Conclusion

Based on the files, records, and proceedings herein, and for the reasons set forth above, IT IS ORDERED that:

Defendants' motion for summary judgment is granted.

LET JUDGMENT BE ENTERED ACCORDINGLY.