Kelly BOWLIN, on behalf of herself
and all others similarly
situated, Plaintiffs,

v.

Nancy MONTANEZ, as the Director of
the Nebraska Department of Health
and Human Services, Defendant.

No. 4:04CV3218.

United States District Court,
D. Nebraska.

April 25, 2005.

Rebecca L. Gould, Patricia A. Knapp,
Nebraska Appleseed Center, Lincoln, NE,
for Kelly Bowlin, Plaintiff.

Royce N. Harper, Attorney General's
Office—Nebraska, Lincoln, NE, Jaime R.
Placek, Office of the Attorney General,
Lincoln, NE, for Nancy Montanez, Defendant.

## MEMORANDUM AND ORDER

SMITH CAMP, District Judge.

This matter is before the Court on cross-motions for summary judgment (Filing Nos. 51 and 53). The parties have briefed the motions and submitted evidence in support of their respective positions (Filing Nos. 52, 54, 57, 59, 60). For the reasons provided below, the Court will grant the Plaintiffs' motion for summary judgment and deny the Defendant's cross-motion for summary judgment.

## PROCEDURAL HISTORY

On June 16, 2004, Plaintiff Kelly Bowlin ("Bowlin") filed a complaint on behalf of herself and a class of needy Nebraska caretaker relatives ("Plaintiffs") in the District Court of Douglas County, Nebraska for declaratory and injunctive relief under 42 U.S.C. § 1983. The class members were certified as follows:

> All caretaker relatives in Nebraska with earned income: a) who have received Medicaid under the medically needy category without a spend down for at least three of the six months prior to having their Medicaid benefits terminated due to their earned income; b) who, but for their earned income would continue to receive Medicaid under the medically needy category without a spend down; and c) who have not been or will not be afforded the transitional Medicaid benefits provided for in 42 U.S.C. § 1396r–6.

(Filing No. 62).

Bowlin alleges they are covered by the language of 42 U.S.C. § 1396u–1, a section of the Medicaid Act that requires certain people to be treated as recipients of Aid to Families with Dependant Children ("AFDC"). In this situation, satisfying the requirements of § 1396u–1 will render the Plaintiffs eligible for Transitional Medical Assistance ("TMA") benefits pursuant to 42 U.S.C. § 1396r–6.

On August 23, 2004, the Court granted Bowlin's Motion for a Preliminary Injunction (Filing No. 41) and enjoined the Defendant, Nancy Montanez, as Director of the Nebraska Department of Health and Human Service ("Director"), from denying TMA pending the final disposition of this case. After reviewing the evidence (Filing Nos. 37 and 40) and briefs submitted by both parties (Filing Nos. 5, 20, 35 and 33), the Court determined Bowlin was likely to succeed on the merits of her claim. On November 5 and December 6, 2004, the Plaintiffs and the Defendant respectively filed motions and cross-motions for summary judgment, briefs, and evidence.

## UNDISPUTED FACTUAL BACKGROUND

■  Plaintiff Kelly Bowlin is the primary caretaker for her two children, ages 5 and 3 (Filing No. 1, ¶ 5). She suffers from abnormal menstrual bleeding, an ongoing medical condition that doctors have been unable to diagnose (*Id.*, ¶ 35). Although Bowlin has undergone hormone therapy and surgery, it has been recommended that she continue to undergo further medical testing. Between October 2002, and December 2003, Bowlin received Medicaid for this ongoing medical condition through an optional State plan that granted benefits to Nebraska's "medically needy" caretakers (*Id.*, ¶ 38). See 42 U.S.C. § 1396a(a)(10)(A)(ii). After a wage increase in September 2003, Bowlin no longer met the statutory requirements. She was declared ineligible for Medicaid coverage January 1, 2004 and was subsequently denied TMA (*Id.*, ¶ 43).

### The Social Security Act and 42 U.S.C. § 1396u–1

Title XIX of the Social Security Act grants federal medical assistance to participating states through its Medicaid pro-

gram. Although a state's participation in the Medicaid program is optional, participating states in compliance with the applicable federal rules and regulations are given matching funds by the federal government. *Schweiker v. Gray Panthers*, 453 U.S. 34, 37, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981).

The federally funded public-assistance program, AFDC, operated in conjunction with Medicaid to provide assistance to the needy and others created under 42 U.S.C. §§ 1396 *et seq.* Under the federal statutes, a person receiving AFDC was also automatically eligible for Medicaid. *Kai v. Ross*, 336 F.3d 650, 651 (8th Cir.2003).

In 1996, the Welfare Reform Bill, under the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act ("PWORA"), replaced AFDC with Temporary Assistance to Needy Families ("TANF"). Under PWORA, recipients of TANF were no longer automatically eligible for Medicare benefits. At the same time the AFDC program was terminated, the legislature enacted 42 U.S.C. § 1396u–1 to ensure certain persons would still be treated as receiving aid under the AFDC. If an individual was treated as receiving AFDC benefits, then he or she would be eligible for TMA under 42 U.S.C. § 1396r–6.

### The Income and Resource Methodologies for Determining Countable Income

The Plaintiffs did not receive Medicaid assistance through AFDC, the AFDC replacement program, TANF, or Nebraska's State plan called Aid to Dependent Children ("ADC"). Rather, they received Medicaid under an optional State plan for medically needy caretaker relatives (Filing No. 15, Answer at ¶ 22). *See* §§ 1396a(a)(10)(A)(ii) *and* 1396a(a)(10)(C). This optional State plan employs a less restrictive methodology than AFDC in determining countable income and resources.[1]

Under the AFDC methodology, Bowlin's countable income was determined to be $971.54, well over the AFDC limit of $611.00 [2] (Filing No. 40, Ex. 4). However, Bowlin qualified for Medicaid benefits under the medically needy category. Her countable income under the optional State plan was determined to be $270.55, well below the $492.00 limit (Filing No. 37, Ex. 4). In September, 2003, Bowlin received a $0.50 raise from her employer (Filing No. 1, Complaint at ¶ 42). She went through the recertification process the following December and her countable income was determined to be $569.22, $77.22 over the medically needy income limit (*Id.*). As a result, she was subsequently denied further Medicaid benefits and TMA.

### Transitional Medical Assistance and 42 U.S.C. § 1396r–6

Once it has been determined that an individual was receiving or treated as receiving AFDC benefits, he or she will be eligible for TMA if the remaining elements of § 1396r–6(a)(1) are met: the individual must have received Medicaid in at least 3

1. Although the Director claims the medically needy category is not related to AFDC, she also confirms that the medically needy methodology is less restrictive than the AFDC methodology. (Filing Nos. 15, Answer at ¶ 23, Filing No. 54, pg. 2).

2. The Director relies on the *present* limit for determining TANF/ADC eligibility. Bowlin asserts that the income limit for the AFDC program in 1996 was actually $673.00. (Filing No. 60, Ex. 2) Although the income limit has varied from 1996 to the present time, the difference between the two numbers offered by Bowlin and the Director is immaterial. Bowlin's countable income under TANF/ADC methodology was well over both the 1996 and present income limit. Bowlin's countable income under the medically needy program was well below both the 1996 and present TANF/ADC income methodology.

of the last 6 months immediately preceding aid ineligibility, and the individual's aid must have been terminated due to hours of, or income from, the employment of the caretaker relative. 42 U.S.C. § 1396r–6(a)(1)(2002 Supp.).

Neither party disputes that the Plaintiffs are caretaker relatives (Filing Nos. 15, ¶ 1 and No. 62), who received Medicaid in at least 3 of the last 6 months immediately preceding aid ineligibility (Filing Nos. 15, ¶ 22, No. 62), and whose benefits were terminated due to hours of, or income from, employment (Filing Nos. 1, ¶ 42; No. 15, ¶¶ 22, 26; and No. 62). Therefore, the only genuine issue to be resolved is a legal issue: whether the statutory language of § 1396u–1 requires that those persons qualifying for Nebraska's medically needy category should be treated as having received AFDC benefits.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 (8th Cir.2003). The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R.Civ.P. 56(c)). The proponent need not, however, negate the opponent's claims or defenses. *Id.* at 324–25, 106 S.Ct. 2548.

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548.

## ANALYSIS

The Plaintiffs contend that as medically needy caretakers, they fall under the class of persons Congress intended to include by enacting § 1396u–1. Once the Plaintiffs are determined to be those treated as having received AFDC benefits, they are then eligible for TMA under § 1396r–6. The Director contends that § 1396u–1 covers only those who qualify for AFDC under the AFDC 1996 income limit, or those who qualify under Nebraska's ADC program, a lesser restrictive methodology. Because the Plaintiffs were receiving Medicaid under Nebraska's medically needy category, 42 U.S.C. § 1396a(a)(10)(A)(3iii), and not under ADC, AFDC, or the replacement program TANF, the Director contends they are not eligible for TMA. Both parties

agree that the additional requisites for TMA under § 1396r–6 are not in dispute.

**The Plain Meaning of the Statute**

■ Interpreting the plain meaning of the statutory language is the starting point for determining congressional intent in enacting the statute. *Dowd v. United Steelworkers of America, Local No. 286,* 253 F.3d 1093 (8th Cir.2001). "If the plain language of the statute is unambiguous, that language is conclusive absent clear legislative intent to the contrary. Therefore, if the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *Id.* at 1099, quoting *United States v. S.A.,* 129 F.3d 995, 998 (8th Cir.1997). Section 1396u–1 reads in part:

> (a) REFERENCES TO TITLE IV–A ARE REFERENCES TO PRE–WELFARE–REFORM PROVISIONS.-[A]ny reference ... **to a provision of part A of title IV, or a State plan under such part** ..., including income and resource standards and income and resource methodologies ... **shall be considered a reference to such a provision or plan as in effect as of July 16, 1996** ....
>
> (b) APPLICATION OF PRE–WELFARE–REFORM ELIGIBILITY CRITERIA.—
>
>> (1) IN GENERAL.—[S]ubject to paragraphs (2) and (3), in determining eligibility for medical assistance—
>>
>>> (A) an individual shall be treated as receiving aid or assistance under ...a State plan approved under part A of subchapter IV of this chapter [AFDC] only if the individual meets ... the income and resource standards for determining eligibility under such plan ... as in effect as of July 16, 1996 ....
>>
>> (2) STATE OPTION.—**For purposes of applying this section, a State**—
>>
>> ...

>>> (A) may lower its income standards applicable **with respect to part A of title IV** but not below the income standards applicable...on May 1, 1988;
>>>
>>> (B) may increase income and resource standards **under the State plan referred to in paragraph (1)** ... by a percentage that does not exceed the percentage increase in the Consumer Price Index...; and
>>>
>>> (C) **may use income and resource methodologies that are less restrictive than the methodologies used under the State plan under such part as of July 16, 1996.**

42 U.S.C. § 1396u–1 (1999).

In determining who is eligible under the pre-welfare reform provisions, the statute indicates that those receiving AFDC under 1996 provisions are eligible, and that "for purposes of this subchapter," eligibility is also *"subject to paragraphs (2) and (3")* (in determining eligibility for medical assistance). In *Kai v. Ross,* the Eighth Circuit interpreted this to mean:

> [T]he effect of the provision is clearly to make eligible for medical assistance not only persons who were receiving AFDC on July 16, 1996, but also certain other persons. Section 1396u–1(b)(1) makes persons receiving AFDC eligible for medical assistance, but the provision is expressly made "subject to paragraphs (2) and (3)." The phrase "subject to" must mean that, in the event of any conflict between (2) or (3) and (1), the former two paragraphs will prevail, or, in the present context, that (2) and (3) add persons to the group that is already eligible under (1) by virtue of being AFDC recipients.

*Kai v. Ross,* 336 F.3d 650, 654 (8th Cir. 2003)(on appeal from denial of motion for preliminary injunction).

Contrary to the Eighth Circuit Court's interpretation of the statute in *Kai,* the Director contends that this statute only applies to those who actually received AFDC under the 1996 guidelines, or to those who currently are receiving ADC/TANF under less restrictive methodologies. The Director asserts that the phrase in Section (b)(2), "for purposes of applying this section," refers only to Nebraska's AFDC equivalent program, ADC, for categorically needy individuals (Filing No. 52, pg. 14, 15). However, if the Director's interpretation were adopted, it would render useless the phrase, "subject to paragraphs (2) and (3)."

The construction of § 1396u–1(b) distinguishes between two categories of persons who qualify under the pre-welfare reform criteria. The first category, § 1396u–1(b)(1)(A), covers those persons who meet the income and resource requirements under the AFDC methodology as of July 16, 1996. Bowlin does not qualify for Medicaid benefits under this category because under the actual AFDC methodology, her income was determined to be $971.54—significantly exceeding the $673 limit.

The second category, § 1396u–1(b)(2)(A–C), sets up three sub-categories of persons who meet pre-welfare eligibility criteria through a State option plan. The first sub-category, (A), states a State may lower its income standards, *"with respect to part A of title IV."* In other words, a State has the option of lowering income standards *with respect to an AFDC plan,* to determine Medicaid eligibility for the purposes of meeting the criteria of AFDC. The second sub-category, (B), states that a State plan may raise the income standards, *"under the State plan referred to in paragraph (1)."* A plain meaning interpretation shows that a State may increase income standards *with respect to an AFDC plan,* to determine Medicaid eligibility. The plain meaning of both sections is that

the State has the option of raising or lowering income restrictions *specifically in relation to the AFDC program.*

The final sub-category under the State option plan, (C), addresses income and resource methodologies. Unlike the two previous categories, the language of this last section *does not limit itself only to an AFDC or AFDC replacement program.* Instead, the plain language illustrates that a State may use less restrictive methodologies than those used "under the State plan under such part [AFDC] as of July 16, 1996."

The Director contends that the statute must be construed as allowing a state to use income and resource methodologies *in relation to AFDC or an AFDC replacement program* that are less restrictive than those used under the State plan under such part as of July 16, 1996. However, unlike the two prior sub-categories ((A) and (B)), sub-category (C) does not limit itself to creating or utilizing less restrictive methodologies *only in relation to the State plan (ADC/TANF).* The third option merely shows that a State may use less restrictive methodologies than those used under AFDC in effect as of July 16, 1996.

As the Eighth Circuit Court stated in *Kai,* "medically needy caretaker relatives are not entitled to Medicaid by reason of any mandatory provision of federal law. But when the State removes these persons [from eligibility], it must do so subject to the condition . . . that they receive Transitional Medical Assistance." Thus, according to the Eighth Circuit Court's plain meaning construction of the statute, Bowlin and the class members are in a category of those persons Congress intended to be treated as having received AFDC benefits under § 1396u–1.

## Qualification under AFDC as it Existed in 1996

The Director argues that the methodology used in determining the countable in-

come under the medically needy category is distinct from AFDC countable income, and therefore cannot be compared. She maintains that even if the methodology is less restrictive, it is not related to AFDC in any way (Filing No. 54, pg. 3). This argument is very similar to the one presented by the *Kai* plaintiffs. In *Kai*, the State argued that the Plaintiffs could not be treated as having received AFDC benefits because they had never qualified for benefits under the AFDC program. Like the Plaintiffs in this case, the *Kai* plaintiffs were eligible for Medicaid benefits through an optional State plan. In both situations, the optional State plan for determining eligibility was less restrictive and in no way related to the AFDC plan. *See Kai*, 336 F.3d at 654. The Eighth Circuit noted that "Section 1931[3] quite clearly covers not only those actually receiving AFDC, but additional persons who are 'treated as receiving.'" *Id.* The Court pointed out that "1931 ... states in no unmistakable terms that it is not limited to AFDC eligibles. Otherwise, the 'treated as' language and the phrase 'subject to paragraphs (2) and (3)' would be meaningless." *Id.*, at 655. Thus, as determined by the *Kai* Court, it is irrelevant that the Plaintiffs had never been eligible for or received AFDC benefits.

**The Impact of the Kai Decision on this Court**

██ The Defendant argues that because the *Kai* Court did not make a final determination of the merits, the decision is not binding precedent. (Filing No. 52, pg. 17). However, as this Court has already noted, "while I acknowledge that the Eighth Circuit Court did not review a final judgment in *Kai*, I am compelled to defer to the Court's construction of the relevant statutes in this case." (Filing No. 41 at 7). In granting the plaintiffs' motion for preliminary injunction, the Eighth Circuit interpreted § 1396u–1 to include medically needy caretakers. The Eighth Circuit Court tacitly acknowledged the nature of the appeal, by allowing that *additional legal argument* might aid in "illuminat[ing] the matter further ..." *Kai*, 336 F.3d at 656. Following the Eighth Circuit Court's decision in *Kai*, the parties reached a compromise and settlement.

To date, the Director has not imparted any additional legal argument not already argued in *Kai*. The Director has offered two letters, an e-mail, and an affidavit as evidence supporting the State's interpretation of § 1396u–1. One of the letters offered by the Director is virtually identical to the letter rejected as mandatory authority in *Kai*. (*See* Filing No. 28, Ex. 10 and 11). In *Kai*, the Eighth Circuit weighed the persuasive value of the letter written by Thomas Lenz, Associate Regional Administrator for Medicaid and State Operations of the Healthcare Financing Administration (now known as the Centers for Medicare and Medicaid Services), and concluded it did not reach the level of deference suggested by *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) (*explaining* the persuasive factors to be weighed.) Rather, the Eighth Circuit "respectfully" considered it, but concluded that the Regional Administrator's interpretation conflicted with the plain meaning of the statute, and the letter lacked inherent persuasive value. *Kai*, 336 F.3d at 655.

██ In addition to the letter by Lenz, (Filing No. 40, Ex. 11), the Director also offers a letter by James G. Scott, Chief Programs Services Branch Division of Medicaid and Children's Health (Filing

---

**3.** "1931" refers to the Social Security Act

citation that parallels 42 U.S.C. § 1396u–1.

No. 40, Ex. 12). Concerning *Kai*, the letter concludes, "we believe the Court of Appeals analysis is incorrect." As expressed in *Chevron*, this letter is entitled to respectful consideration, which it has received, but it carries no legal or authoritative weight. The Director has failed to show how the persuasive value of this writing differs from, or is more influential than, the Lenz letter.

The Director also offers into evidence an affidavit by Marinos Svolos (Filing No. 57) and e-mail correspondence between the employees of the Department of Health and Human Services and Rebecca Gould (Filing No. 40, Ex. 13). Yet, much like the two letters offered in evidence, the Svolos affidavit carries little evidentiary value and no legal weight, because it "is not a regulation of the Department of Health and Human Services, nor is it part of generally published advice." *Kai*, 336 F.3d at 655. After respectfully considering the additional information that was not before the Court in the *Kai* matter, I have found nothing in the new evidence that distinguishes the analysis required in this case from the analysis of the Eighth Circuit Court in *Kai*.

The Director has attempted to distinguish *Kai* based upon the manner in which the Plaintiffs' ineligibility arose. Unlike *Kai*, the Plaintiffs' benefits were terminated due to an increase in income, and not due to a statutory change. However, the factual distinctions I find between the Plaintiffs herein and the *Kai* plaintiffs are immaterial to the outcome of these motions because the factors that precipitated their ineligibility do not affect the analysis concerning the applicability of § 1396u–1 to medically needy caretakers, Moreover, § 1396r–6 clearly indicates that benefits will be provided for those whose ineligibility arises from an increase in hours of, or income from, employment.

The Director reminds the Court that once an individual no longer qualifies for Medicaid benefits under the medically needy category, he or she has the option of applying for benefits through Nebraska's medically needy excess income shared cost program (Filing No. 54). Although Bowlin may apply for the spend-down program, she is under no absolute obligation to do so. Despite the fact that both the spend-down program and TMA provide Medicaid benefits, the type of assistance granted is not the same. The spend-down program requires Bowlin to apply for benefits and, upon acceptance, pay approximately $77 per month (the monthly amount by which the medically needy limit is exceeded). To the contrary, relief under TMA requires no application, no further payment, and is automatically extended for a period of six months to one year after Medicaid ineligibility. Because the Plaintiffs are under no obligation to exhaust all other remedies before applying for TMA, they need not seek relief under the spend-down program before seeking benefits through the TMA program.

**The Three Requirements under § 1396r–6**

The first requirement under § 1396r–6 provides that one must be receiving aid pursuant to a plan of the State approved under part A of subchapter IV [AFDC]. Because the Plaintiffs are those treated as having received AFDC, this first requisite is met. Second, persons must have received the Medicaid benefits in at least 3 of the 6 months immediately preceding the month in which the family becomes ineligible for aid. Bowlin meets this requisite as she received aid under the medically needy category from August 2002 until December 2003 (Filing No. 15, ¶ 22). The final requisite is met because Bowlin is a caretaker relative who became ineligible for aid be-

cause of hours of, or income from, employment (Filing No. 15, ¶ 26).

## CONCLUSION

The Court finds that the Plaintiffs do fall within the guidelines of those treated as receiving AFDC under § 1396u–1. Bowlin's countable income under the less restrictive, medically needy category was $250.77. This falls within the 1996 AFDC limits of $673.00 for a household of three. Pursuant to the Eighth Circuit Court's plain reading of the statute, the State must extend TMA not only to those who qualified under 1996 AFDC guidelines and those qualifying under less restrictive AFDC replacement plans, but also to those who under State option plans have been treated as having received AFDC. The Director has presented no additional evidence nor made any new arguments that would sway this Court to rule contrary to the Eighth Circuit Court's previous construction of § 1396u–1.

The Plaintiffs meet the statutory requirements of both §§ 1396u–1 and 1396r–6 and are therefore entitled to Medicaid benefits through Transitional Medical Assistance. For these reasons, the Court will grant the Plaintiffs' motion for summary judgment and deny the Defendant's motion for summary judgment.

IT IS ORDERED:

(1) Plaintiffs' Motion for Summary Judgment (Filing No. 51) is granted in all respects;

(2) Defendants' Motion for Summary Judgment (Filing No. 53) is denied in all respects;

(3) Plaintiffs' Motion to Strike Affidavit (Filing No. 58) is denied;

(4) The Clerk of the Court is directed to strike Filing No. 55 and Filing No 56 as improperly filed; and

(5) A separate judgment will be entered accordingly.